943 S.W.2d 766 (1997)
J.L.S., Appellant/Cross-Respondent,
v.
D.K.S., n/k/a S.D.S., Respondent/Cross-Appellant.
Nos. 68859, 68874.
Missouri Court of Appeals, Eastern District, Division Four.
March 11, 1997.
Motion for Rehearing and/or Transfer Denied May 1, 1997.
*768 Susan M. Hais, James P. Carmody, Clayton, for Appellant.
Elizabeth Harris Christmas, Brentwood, for Respondent.
Motion for Rehearing and/or Transfer to Supreme Court Denied May 1, 1997.
*769 SIMON, Judge.
J.L.S. (mother) appeals and D.K.S. n/k/a S.D.S. (father) cross-appeals from a decree of dissolution of marriage entered by the Circuit Court of St. Charles County.
On appeal mother contends that the trial court erred in that: (1) the visitation provisions of the trial court's decree are in contravention of the mandatory language of § 452.400.2 RSMo 1994 (hereinafter all references are to RSMo 1994 unless otherwise indicated) because the decree arbitrarily removes its restrictions on father's visitation on a specific date in the future without requiring a hearing or showing that father is rehabilitated; (2) there is no substantial evidence to support the visitation provisions of the decree in that a) the commencement of unsupervised visitation upon the expiration of one year is a prospective attempt to modify a final judgment without procedures for the court to determine if it is in the best interest of the minor children and b) the counseling provisions of the decree are unduly vague and grossly inadequate to serve the purposes of preparing the minor children for visitation with father at some time in the future; and (3) the award of joint legal custody is not in the best interest of the children because it is unsupported by substantial evidence in that the overwhelming evidence is that the parties now do not share any commonality of beliefs regarding the raising of the minor children.
In his cross-appeal, father contends that the trial court's decree stating that father will not cohabit with other transsexuals or sleep with another female, bears no relationship to the best interest and welfare of the minor children, violates his constitutional rights and is an undue hardship on father. We affirm in part, reverse in part and reverse and remand in part.
The decree must be affirmed if it is supported by substantial evidence, it is not against the weight of the evidence, and it neither erroneously declares nor applies the law. Carter v. Carter, 901 S.W.2d 906, 909[1-3] (Mo.App. E.D.1995). We must accept as true the evidence and permissible inferences therefrom in the light most favorable to the decree and disregard all contrary evidence and inferences. Id. Where there is a conflict in testimony, we defer to the trial court's determination of the credibility of the witnesses. Id.
Certain facts are undisputed. Mother and father were married on March 19, 1983 and two sons were born of the marriage. The oldest child was eight at the time of trial and the youngest was five.
Circumstances, occurring before and during the marriage, culminated in father having male to female "sex-reassignment" surgery. Father told mother of a few instances of cross-dressing he had prior to the marriage, but assured her that they were resolved. However, throughout the marriage, father secretly struggled with urges to cross-dress.
In June 1991, the parties were living in Clinton, Maryland. The marriage was strained at this time. Mother brought the two children to Missouri to visit her family. When she returned to Maryland, father told her he had seen a social worker about his problems. The parties saw a series of counselors and psychologists. Father requested a separation for one year while he participated in a "Real Life Test," during which he would live as a woman "24 hours a day." Prior to the separation, mother and father had a talk with the boys about the pending separation, but nothing was mentioned about the "Real Life Test" or father's struggle with his gender.
On August 1, 1992, the parties separated. They signed a separation agreement which father drafted. They agreed mother would have sole, permanent care and custody of the children, and father would refrain from visiting them for at least one year while he participated in his "Real Life Test." Mother filed a complaint for limited divorce in the State of Maryland. She filed a copy of the separation agreement with the Maryland court. Father told a court-appointed psychologist that he did not intend to end the marriage at the time of the August 1992 separation. Instead, he planned to have sex-reassignment surgery and remain married. Father proposed that the parties continue to live together and that his sons call him "Aunt Sharon." The dissolution action was dismissed prior to a judgment being entered.
*770 Mother moved to Missouri with her sons and father has had no face-to-face contact with the boys since the August 1992 separation. He tried to contact the boys by telephone and letter but mother refused to allow any contact. Both boys have experienced emotional difficulties since the parties' separation and have been under the care of a psychologist. The oldest boy expressed "suicidal ideations" and had been unhappy because he and mother had to move away from father. He was prescribed antidepressant medication. The youngest boy was diagnosed with attention deficit disorder.
In 1993, approximately seven months after the dismissal of the Maryland action, Mother filed a petition for dissolution in Missouri which alleged in pertinent part:
15. That [father] has behaved in such a manner that [mother] cannot reasonably be expected to live with him.
16. That [father] has adopted a lifestyle such that it would be extremely harmful to the minor children for them to be placed even in the temporary custody of or visitation with [father]. That denying visitation and temporary custody to [father] is clearly in the best interests of the minor children.
Father filed a response to the petition alleging that he had been diagnosed "gender dysphoric" and had pursued treatment and rehabilitation medically indicated by this condition. Father denied that he "adopted a lifestyle," but rather that the change in his lifestyle was medically necessary for his health. He also denied that the change in his lifestyle would be "injurious per se" to the children. Further, father alleged that mother had failed to inform him about the children's development and health and denied him any contact with the children.
Mother filed a request with the court for a mental examination of father pursuant to Rule 60.01. Mother stated that she believed father to be emotionally and mentally unstable and that it would be detrimental and confusing to the children to be around father who was living as a woman. Subsequently, father moved for a mental and physical examination of mother. The court granted the parties' motions and exams were ordered to be performed by a court-appointed doctor, Dr. Partridge.
About two months before trial, father underwent "sex-reassignment" surgery. At trial mother and father testified and each presented the testimony of two experts. Mother testified that the boys had adjustment problems as to the move and the separation of the parents and were under the care of a psychologist. The oldest son was depressed, had "suicidal ideations," and was given anti-depression medication. The youngest son has been diagnosed with attention deficit disorder. Mother asked the trial court for full physical and legal custody and that "under these circumstances that there be no face-to-face visitation between father and the boys."
Father testified that he wanted to be part of the boys' lives and that he loved them but agreed that they would need counseling in order to understand what was going on and to help with their adjustment.
Three experts testified in court and a fourth's testimony was presented by deposition. The trial court found father's experts to be credible. Both had significant experience with gender identity disorders and relationships of transsexuals to their children. The court found that father's expert, Dr. Brown, was an "expert's expert." Further, it found that mother's experts lacked credibility because neither had any experience in gender identity disorders or transsexualism. Although the trial court found that one of mother's experts "formed his opinions after one or two sessions with [mother] without ever seeing the children," the testimony of the experts as set forth in the record on appeal clearly indicates that each of mother's experts, including Mr. Wilkinson, interviewed the children, while father's experts did not interview the children.
All of the experts agreed that immediate face-to-face contact would harm the boys if they were to see father in his present status and that the boys would need counseling to assist in their reunification with father. Further, they agreed that the boys' progress should be monitored and that personal contact should happen when the boys are ready. While mother's experts stated that the boys *771 would not be equipped to handle and understand their father's status change until they reached the age of twelve, father's experts disagreed with placing an age restriction on the boys but rather stated that the approved course of treatment would be to start with telephone contact, conference call situations, therapy sessions and then "move to personal contact down the road, depending on how things progressed."
Dr. Brown, a psychiatrist specializing in gender disorders, and Pamela Marcus, a registered nurse and counselor, testified on behalf of father. Dr. Brown stated that the children and father needed to engage in some period of counseling in order to facilitate the adjustment period. Further, that the approved course of treatment to unify the children and their father would be to start with "telephone contact, conference call situations and then move to personal contact down the road, depending on how things progressed." He stated that no harm would come to the children if they were to meet father in his present status "if it fell in sequence with what I have said." When asked how long the process should take, he responded, "I wouldn't be able to predict that for you." Finally, he stated that it would be emotionally confusing for the boys to see their father as a woman immediately, that the adjustment process could take a year, and that the progress of the boys should be monitored.
Nurse Marcus testified that in her experience of observing children relating to a transsexual parent, children have been able to relate to the parent in an appropriate fashion. She indicated that father should have contact with the children but that counseling or therapy for the entire family would be imperative. The therapy for the children should be monitored, age-appropriate, and would need to be scheduled prior to seeing father. When asked for a length of time for therapy she stated that it would depend "on how the dynamics go between [father] and the children."
William Wilkinson, a licensed professional counselor, and Dr. Linda Partridge, the court-appointed psychologist, testified on behalf of mother. Wilkinson testified that if the boys were to see their father immediately there could be depression, withdrawal, anger, and violent reactions. He stated that the boys would not be equipped to understand father's choice until they reached the age of twelve and that they would need counseling to learn to relate to father.
Dr. Partridge also stated that the boys should not be exposed to father's situation until the age of twelve because it would cause emotional upheaval, embarrassment, and confusion. She stated that all of the parties would need to be reevaluated before personal contact should actually occur.
On June 1, 1995, the trial court entered its Decree and Judgment of Dissolution of Marriage. The court amended the decree on June 20, 1995, and mother filed a motion for new trial on June 28, 1995, contending that the amended decree was not in accord with the credible evidence and that father's temporary custody is against the best interest of the minor children.
On July 19, 1995, the trial court entered its Findings of Fact and Second Amended Decree and Judgment. The trial court found, while "there was no request for findings, the court finds and believes from the evidence that it would be in the best interest and welfare of the minor children, that they be reunited with [father]." It noted that the evidence clearly established that father was a loving and caring father and that mother would not have a problem with his contact with the children if he was not acting like a woman. Further, it found that mother had interfered with the relationship of the minor children and their father. Additionally, the court found mother evasive in her answers regarding whether she would comply with the court's order of visitation and temporary custody. The Second Amended Decree reads in pertinent part:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED AS FOLLOWS:
1. Family Counseling:
(a) That [mother], [father] and the minor children engage in family counseling not less often than once each month for a period of twelve months, in order to effectuate *772 the reunification of the family and contact with [father] ...
2. Child Custody:
(a) That [mother] is awarded the primary care, custody and control of the parties' minor children, ... subject to reasonable rights of visitation and temporary custody in [father], provided during those periods in which the minor children are in the temporary custody of [father], [father] shall not cohabit with other transsexuals or sleep with another female. Said visitation and temporary custody shall commence on the third full weekend of the month on the twelfth month after the Entry of the Decree of Dissolution as follows:
i) The third full weekend of each month ...
ii) Two weeks during the summer ...
iii) Alternating major holidays ...
(b) That [father] shall immediately be allowed telephone contact with the minor children at all times, ... [and][f]or the first sixty (60) days following the entry of the Decree, [father] shall not discuss with the minor children gender related issues.
(c) That [father] shall immediately be allowed to send letters, gifts and other correspondence to the minor children, and [mother] is ordered to deliver those items to the children. For the first sixty (60) days following the entry of the Decree, [father] shall not discuss with the children gender related issues.
(d) That the parties shall confer with one another in the exercise of the decision-making rights, responsibilities and authority and have an equal voice on issues regarding the children's training, education and rearing,....
Since mother's appeal is directed to the visitation and legal custody provisions of the decree and father's cross-appeal is directed to a restriction on his association and cohabitation during the exercise of his visitation rights, the remainder of the decree is affirmed.
In her first point on appeal, mother, relying on § 452.400.2, essentially contends that the trial court erred in removing restrictions on father's visitation on a specified date in the future without requiring, as a precondition to the removal of the restrictions, a hearing or an affirmative showing by father of rehabilitation and treatment.
However, a review of § 452.400.2 shows that the subsection addresses the modification of visitation arrangements. Here, we are addressing the original grant of visitation rights to father which is covered by subsection 1 which provides in pertinent part:
1. A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his emotional development.
Although mother relies on the incorrect section for her argument, we address her contention that because a restriction was placed upon father's visitation rights, a hearing and a reevaluation of the parties should occur prior to the visitation with father.
The trial court's order provided that father's visitation rights would not begin until twelve months after the entry of the decree. Thus, the trial court placed a restriction on father's visitation. See In re Marriage of Amos, 843 S.W.2d 946, 952 (Mo. App. S.D.1992). When the trial court places a restriction on father's visitation rights it ordinarily should make a finding of impairment of emotional development. Van Pelt v. Van Pelt, 824 S.W.2d 135, 137 (Mo.App. W.D. 1992). Here, although the trial court did not make an express finding of impairment, it is implicit from its finding of no immediate contact, that immediate contact between the children and father would impair the boys' emotional development. Id.
Further, the implicit finding is clearly supported by the evidence. All the experts agreed that father's immediate contact with the children would cause harm to them. When father's expert, Dr. Brown, was asked how long the reunification process should take, he responded, "I wouldn't be able to predict that for you." He also stated that it would be "emotionally confusing" for the boys to see their father as a woman immediately, and that the adjustment process could take a year. Moreover, father testified that *773 the boys would need counseling to understand what has occurred and to help them adjust. Thus, a review of the record clearly supports the trial court's implicit finding of impairment.
The record on appeal indicates that the twelve month period restricting father's visitation has expired. However, the record is absent of any showing that counseling has occurred or the present mental and emotional state of the children and parents. During oral argument, it was indicated that the boys have been told nothing of father's status. Clearly, in the best interest of the children, a reevaluation of all parties must occur before the boys are exposed to a situation that father's experts deemed as harmful to them if they have not been correctly prepared. See Roberts v. Roberts, 810 S.W.2d 65, 67 (Mo.App.1990) (wherein the trial court set a hearing five months from the date of the entry of the last decree to reevaluate the parties and circumstances before lifting a restriction on father's visitation rights).
This is a unique situation and it is imperative that evaluations of the parents and children are made prior to the children's face-toface reunification with father. At the time of the entry of its decree, the removal of the restriction on father's visitation rights at the end of twelve months was not supported by the evidence. As of the date of this opinion, approximately twenty months have passed since the entry of the decree. Thus, on remand the trial court should determine the mental and emotional status of the parents and children to determine what is in the best interest of the children. Based upon those findings the trial court should decide what remedial measures, if any, should be taken to insure the best interest of the children are served while working toward their reunification with father. Likewise, the trial court should structure a visitation schedule appropriate to the children's best interest.
In her second point on appeal, mother contends that the trial court erred in that there is no substantial evidence to support the visitation provisions of the decree in that a) the commencement of unsupervised visitation upon the expiration of one year is a prospective attempt to modify a final judgment without procedures for the court to determine if it is in the best interest of the minor children and b) the counseling provisions of the decree are unduly vague and grossly inadequate to serve the purposes of preparing the minor children for visitation with father at some time in the future. Since we have already determined under the first point that father's visitation rights shall not commence until the trial court has determined that the children and parents are emotionally and mentally ready for contact, we need not address mother's first subpoint.
In her second subpoint, mother contends that the psychological counseling provisions of the decree are unduly vague and grossly inadequate to serve the purpose of preparing the children for visitation with father in the future. Under the terms of the decree, mother and the children were to engage in counseling at least once a month for a period of twelve months and father was to engage in counseling with his own counselor.
Mother argues that the counseling provisions are vague and inadequate because the provisions do not require: 1) communication between or among the counselors; 2) the issuance of formal or informal reports; and, 3) the presence or participation of the counselors during the unsupervised visitation father is to have in the future. In light of the unusual issues involved in this case, and the delicate age of the children, mother argues that the counseling provisions fail to serve the best interest of the children.
In light of the fact that we are requiring the trial court to conduct a hearing to evaluate the children's progress toward physical reunification with their father, we also believe that the court should require evidence of successful counseling before implementing reunification. Given the dramatic change in father's new identity, it is impossible to predict what effect his sex reassignment will have upon the children. We believe that the children's best interest require that the counseling provisions insure that reunification proceeds with as little emotional trauma or psychological damage to the children as possible. If the trial court finds, after the hearing, that the children are not emotionally and mentally suited for physical *774 contact with their father, then the trial court should not order visitation until such time as the parties demonstrate it is in the children's best interest to do so.
In her final point, mother contends the trial court erred in that the award of joint legal custody is not in the best interest of the children, it is unsupported by substantial evidence and the overwhelming evidence indicates that the parties now do not share any commonality of beliefs regarding the raising of the minor children. We agree.
Joint legal custody means that the parents share in the decision-making regarding the important events in the child's life. Lipe v. Lipe, 743 S.W.2d 601, 602 (Mo.App. 1988). A commonality of beliefs concerning parental decisions and the parties' ability to cooperate and function as a parental unit are important considerations when determining whether joint legal custody is in the best interest of the child. In re Marriage of Haynes, 913 S.W.2d 73, 75 (Mo.App.1995).
The statutory preference for joint custody "is not that of a forced joint custody in order to induce the parents to find a common ground," but it is a preference in favor of parents who demonstrate "the willingness and ability to share the rights and responsibilities of child-rearing even after they have dissolved the marriage." In re Marriage of Johnson, 865 S.W.2d 412, 417 (Mo.App.1993)(quoting Margolin v. Margolin, 796 S.W.2d 38, 49 (Mo.App.1990)). Joint legal custody is only appropriate where the parents show the willingness and ability to share the rights and responsibilities of raising their children. Leone v. Leone, 917 S.W.2d 608, 614 (Mo.App.1996). Where the parties are unable to communicate or cooperate and cannot make shared decisions concerning their children's welfare, joint legal custody is inappropriate. Id.
In order to support an award of joint legal custody, there must be substantial evidence that the parties have a commonality of beliefs regarding the parental decisions and the willingness and ability to function as a parental unit in making decisions. It is error for the trial court to award joint legal custody if no substantial evidence exists. Hankins v. Hankins, 920 S.W.2d 182, 186 (Mo.App.1996). The lack of evidence of conflict between the parents over raising the child does not meet the affirmative proof required to demonstrate that the parents are equipped to function as a unit to make parental decisions. Johnson, 865 S.W.2d at 417. The record here is void of substantial evidence that these parents have a commonality of beliefs concerning parental decisions or are capable of functioning as a parental unit in making those decisions.
Father argues that the award of joint legal custody is supported by substantial evidence. According to father, the record demonstrates that it was necessary for the trial court to award joint legal custody because otherwise mother would continue to interfere with his relationship with his children. In essence, father appears to argue that the award of joint legal custody was necessary to insure that he would have continued contact with his children. We find that father's argument is without merit. Joint legal custody was not designed to insure that a parent maintains his or her relationship with the child, but was designed to facilitate the best interest of the child by allowing both parents to share in the decision-making of raising the child.
Additionally, the evidence adduced at trial does not support the award of joint legal custody. First, mother and father have not functioned as a parental unit for at least four years. In that period of time, father has not actively engaged in the decision-making of raising his two children. Second, the ability of mother and father to make decisions regarding the children is further frustrated by the fact that mother and children live in Missouri while father lives elsewhere. Finally, there was no substantial evidence adduced at trial regarding how father's sex reassignment surgery and new identity will affect the manner in which mother and father function as a parental unit when making important decisions regarding the children.
There was no basis for concluding that the parents are willing to share the rights and responsibilities of raising their children. We find the order granting joint legal custody is *775 unsupported by substantial evidence and therefore must be reversed. Since there was no evidence to support the award of joint legal custody, we believe that actual legal custody should have been awarded to mother. Rule 84.14 permits the appellate court to give judgment as the trial court ought to have given under the circumstances. See Burkhart v. Burkhart, 876 S.W.2d 675, 680 (Mo.App.1994). In the interests of judicial economy, we reverse the trial court's finding of joint legal custody and award mother sole legal custody.
In his cross-appeal, father contends the trial court erred in ordering that during father's temporary custody "[he] shall not cohabit with other transsexuals or sleep with another female...." Father contends that the trial court's order places an undue hardship on him, is in violation of his constitutional rights and bears no relationship to the best interest and welfare of the minor children. However, father cites no authority for his position.
The trial court is vested with broad discretion in determining child custody and our principal concern is, as is the trial court's in awarding custody, the best interest of the children. S.E.G. v. R.A.G., 735 S.W.2d 164, 165 (Mo.App. E.D.1987); § 452.375. In determining the best interest of the children, the court may consider the conduct of the parents. In re Marriage of Campbell, 868 S.W.2d 148, 153 (Mo.App. S.D.1993). There must be consideration of what conduct a parent may inspire by example, or what conduct of a child a parent may foster by condonation. Past and present activities may be a reliable guide to the priorities of a parent. M v. M, 688 S.W.2d 384, 386 (Mo.App. S.D. 1985). Consideration of conduct is not limited to that which has in fact detrimentally affected the children. Id.
Here, father testified that he is living as a woman with two other women, one of whom is a transsexual. He admitted that he has, on at least one occasion, had a female stay at his home and sleep in his bed, but denied having any sexual relations since the surgery.
Father argues that the "restriction on [his] cohabitation and private life is beyond the purview of the trial court and an abuse of discretion." However, the court cannot ignore the effect which the conduct of a parent may have on a child's moral development. G.A. v. D.A., 745 S.W.2d 726, 728 (Mo.App. W.D.1987); See S.E.G., 735 S.W.2d at 165. There is substantial evidence to support the judgment of the trial court. We do not find an abuse of discretion. Point denied.
We find that the trial court erred in granting joint legal custody and further in removing the one year restriction placed on father's visitation rights without an evaluation of the progress that the parents and children have achieved toward the effectuation of unification of the children and father.
Therefore, the judgment is affirmed in part, reversed in part and reversed and remanded in part with directions to proceed in accordance with this opinion.
RHODES RUSSELL, P.J., concurs.
KAROHL, J, dissents in part in separate opinion.
KAROHL, Judge, dissenting in part.
Except for an award of joint legal custody the trial court entered a remarkable decree in a difficult and unique case. It ruled without the benefit of factual precedent on the only source of dispute, father is a gender dysphoric. Mother did not allege or offer evidence to support a finding D.K.S. was not a loving father in all respects, at all times, except for his condition. She alleged his "adopted ... lifestyle [would be] extremely harmful to the children." For that reason alone she would have the court deny the children any contact with their father, even visitation.
The trial court expressly found "[t]he evidence clearly established that Respondent was a loving and caring father; that the children had a significant bond with their father." The key to a review of the decree is the court's recollection of mother's testimony, "she would not have a problem with his contact with [the boys] on an overnight basis... if he acted in no way like a woman." *776 Another insight into the wisdom of the trial court are the provisions employed to reintroduce the children where the court found "Petitioner had interfered with the relationship of the minor children with their father, refusing to allow even telephone contact or letters to be received by the children, even though the children asked to see their father and had told Petitioner they missed him."
The decree was supported by findings of the court that mother's two experts had no experience in "gender identity disorders or transsexualism." One of mother's witnesses never saw the children. Mother's other expert acknowledged the expertise of father's expert and the court found his opinion did "not appear ... to be supported by medical authority as competent as that of [father's] authority." Mother's witnesses would not support a finding, expressed or implied, of endangerment. The trial court found their testimony unconvincing and we are bound by that finding.
Father's expert, Dr. Brown, was found to be "an expert's expert" with vast knowledge of the subject matter. Dr. Brown recommended "that it was imperative that the children be reunited with their father ... [denial]... would be the worst thing the court could do." We must defer to the trial court where its findings and conclusions are supported by the evidence on all issues, including temporary custody, except the award of joint legal custody. Dr. Brown did not testify immediate visitation would cause the children harm because of his condition. He supported a gradual re-introduction to avoid harm. The court made no express finding of endangerment because of father's condition. Considering the careful, lengthy and detailed decree, it is very unlikely it reached any implied finding of endangerment. The delay of temporary custody was supported as a matter of kindness and good judgment without evidence father was dangerous. He was not. The decree awarded delayed, unrestricted temporary custody to permit a gradual adjustment, not to change father or his new persona. The trial judge is no longer in office. The only certain result of a reconsideration of the temporary custody is hardship and continued estrangement. My analysis of this appeal follows.
J.L.S. (Mother) appeals from a decree of dissolution of marriage. D.K.S. n/k/a S.D.S. (Father[1]) cross-appeals from the same decree. All of the appeal and cross-appeal issues involve child custody and visitation.
Mother and Father were married on March 19, 1983. Two children were born of the marriage. The first child was born in 1986. He was eight years old at the time of trial. The second child was born in 1989. He was five years old at the time of trial.
The unusual circumstance in the marriage culminated in Father's male to female "sex-reassignment" surgery. Father mentioned his gender-identity problem before marriage. He struggled with the problem throughout the marriage.
In June, 1991, the parties were living in Clinton, Maryland. The marriage was strained at this time. Mother brought the two children to Missouri to visit her family. When she returned to Maryland, Father told her he had seen a social worker about his problem. The parties saw a series of counselors and psychologists. Father requested a separation for one year while he participated in a "Real Life Test," he would live as a woman "24 hours a day." Prior to the separation, Mother and Father had a family talk with the boys.
On August 1, 1992, the parties separated. They signed a separation agreement which Father drafted. They agreed Mother would have "sole, permanent care and custody" of the children and Father would refrain from visiting them for at least one year. Mother filed a complaint for limited divorce in the State of Maryland. She filed a copy of the separation agreement with the Maryland court.
*777 Father told a court-appointed psychologist that he did not intend to end the marriage at the time of the August, 1992, separation. He intended to have surgery, but wanted to remain married. He proposed that they continue to live together and the children call him "Aunt Sharon."
Mother dismissed the Maryland dissolution cause of action. She moved to Missouri with her sons. Father has had no face-to-face contact with the boys since the August, 1992, separation. He tried to contact the boys by telephone and letter. Mother refused to allow any contact. Both boys have experienced emotional difficulties since the parties' separation. The older boy expressed "suicidal ideations" and was prescribed anti-depressant medication. The younger boy was diagnosed with attention deficit disorder. Their afflictions were not attributed to father.
About two months before this case was tried, Father underwent sex-reassignment surgery. At trial, four health care experts testified about visitation issues. On July 19, 1995, the trial court entered its "SECOND AMENDED DECREE AND JUDGMENT OF DISSOLUTION OF MARRIAGE." The trial court found, "[w]hile there was no request for findings, the court finds and believes from the evidence that it would be in the best interest and welfare of the minor children, that they be reunited with [Father]." It noted:
[t]he recommendations of both Dr. Brown and Ms. Marcus were that it was imperative that the children be reunited with their father. Both suggested that there be a period of counseling, in order for the children to adapt to the situation and to learn to deal with it.
It ordered:
1. Family Counseling:

(a) That [Mother], [Father] and the minor children engage in family counseling not less often than once each month for a period of twelve months, in order to effectuate the reunification of the family and contact with [Father].
* * * * * *
2. Child Custody:

(a) That [Mother] is awarded the primary care, custody and control of the parties' minor children, ... subject to reasonable rights of visitation and temporary custody in [Father], provided during those periods in which the minor children are in the temporary custody of [Father], [Father] shall not cohabit with other transsexuals or sleep with another female. Said visitation and temporary custody shall commence on the third full weekend of the month on the twelfth month after the Entry of the Decree of Dissolution....
* * * * * *
(b) That [Father] shall immediately be allowed telephone contact with the minor children at all times,....
* * * * * *
(c) That [Father] shall immediately be allowed to send letters, gifts and other correspondence to the minor children, and [Mother] is ordered to deliver those items to the children. For the first sixty (60) days following the entry of the Decree, [Father] shall not discuss with the children gender related issues.
(d) That the parties shall confer with one another in the exercise of the decision-making rights, responsibilities and authority and have an equal voice on issues regarding the children's training, education and rearing,....
In her first point Mother argues the trial court erred in removing restrictions on Father's visitation on a specified date in the future without requiring, as a precondition to the removal of the visitation restrictions, a hearing or an affirmative showing by Father of rehabilitation and treatment. She relies on § 452.400.2 RSMo Cum.Supp.1993. The relevant portion of subsection 2 states:
2. The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair his emotional development. When a court restricts a parent's visitation rights or when a court orders supervised visitation because *778 of allegations of abuse or domestic violence, a showing of proof of treatment and rehabilitation shall be made to the court before unsupervised visitation may be ordered. (Our emphasis).
Mother argues: (1) the trial court's judgment delaying Father's visitation for one year is a "restriction" of his visitation rights; (2) the trial court restricted Father's visitation for the implicit reason that such visitation would impair the boys' emotional development; (3) the trial court could not prospectively remove the restriction on visitation without subsequent proof of treatment and rehabilitation; and, (4) the trial court's judgment misapplies the law and must be reversed because it removes its own restrictions on Father's visitation without complying with the mandatory requirements of § 452.400.2 RSMo Cum.Supp.1993.
Father also relies on § 452.400.2 RSMo Cum.Supp.1993 for his cross-appeal. Father argues: (1) the trial court's judgment delaying his visitation rights for one year is a "restriction"; (2) the trial court could not restrict his visitation because it did not make the required finding visitation would endanger the children's physical health or impair their emotional development; and, (3) the trial court should have granted visitation effective immediately.
The parties have misinterpreted subsection 2 of § 452.400 RSMo Cum.Supp.1993. Subsection 2 addresses the modification of visitation arrangements. The judgment appealed from is the original grant of visitation rights.
Subsection 1 addresses the court's power to grant visitation rights in the first instance. The relevant portion of subsection 1 states, "1. A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his emotional development." Section 452.400.1 RSMo Cum.Supp.1993. The trial court must determine what "reasonable visitation rights" are under the circumstances of each case. In this case, the trial court honored the statute. It did not "restrict" visitation rights, rather it granted what it found to be reasonable visitation rights without finding endangerment. It made no finding of endangerment. We have no authority to impose an implied finding where it is not possible for an appellate court to determine, with certainty, the motive for the delay. The long separation alone, the separation and Father's condition, or only Father's condition may be the basis for the trial court's decision. In the absence of evidence to support a finding where there is the possibility of various findings, there is no basis to reject the allowed visitation. In VanPelt v. VanPelt, 824 S.W.2d 135 (Mo.App. W.D.1992) the court considered a very different issue with reference to an implied finding of endangerment. There was only one possible basis for denying mother any visitation. The statute is unambiguous in assigning that responsibility to the trial court. The one-year delay is not a "restriction" for purposes of the statute, therefore no finding of endangerment to the boys' physical health or impairment of their emotional development is necessary. There is no evidence to support the conclusion the implicit reason for the delay is impairment of the boy's emotional development. It is an accommodation to the years of absence of contact caused by both parents. The relevant inquiry in this case is whether the trial court abused its discretion in awarding visitation to Father with no restrictions beginning on a certain date in the future, together with provisions designed to effectuate the reintroduction of Father with the children and children with Father. In Roberts v. Roberts, 810 S.W.2d 65 (Mo.App. 1990), we affirmed the requirement of temporary arrangements guiding father's visitation rights without a showing that this visitation would endanger the children's physical health or impair their emotional development. Id. at 67. In Roberts we found:
[a] review of the evidence in the case discloses a lack of emotional control on the part of appellant and respondent incident to the breakup of their marriage and an inevitable effect upon the children. The trial court, within the authority granted pursuant to § 452.400, RSMo 1986, concluded that temporary restrictions on appellant's rights of visitation would aid the healing process. Id.

*779 The court did not abuse its discretion in imposing a temporary arrangement delaying father's visitation rights. Under the circumstances of that case such an arrangement was reasonable.
In this case, Father's own evidence supported the temporary delay of face-to-face contact for one year, to give all parties, especially the children, time to adapt to the dissolution and Father's new identity. Responding to a question about what would be the appropriate process for reuniting Father with his children, Father's expert testified, "It would start with telephone contact, conference call situations and then move on to personal contact down the road, depending on how things progressed." Father's expert also agreed with the statement that he was "not recommending to the Court ... that tomorrow or next Monday, whenever his order come [sic] down, that there be immediate contact [between Father and the children],..." He suggested that the parties and the children would need counseling before personal contact to deal with the confusion which would naturally be felt by the children. Father's expert invited the court to order a delay before Father see the children face-to-face. Under these circumstances, the temporary delay of face-to-face contact for a year while get-acquainted activities were in process was reasonable. Here, the parent not granted custody of the children was granted reasonable visitation rights in accord with his own evidence.
Furthermore, the provision in the judgment for the parties and the children to seek counseling "to effectuate the reunification of the family and contact with [Father]" is not a statutory restriction on Father's visitation rights. The success or completion of counseling was not ordered as a pre-condition or limitation on the starting date of Father's temporary custody and visitation rights. The decree provides Father's temporary custody and visitation rights "shall commence on the third full weekend of the month on the twelfth month after the Entry of the Decree of Dissolution" without pre-condition. The parties' failure to benefit from the court's request for counseling may be relevant to future proceedings. However, the counseling provision constitutes a request, rather than a restriction on Father's visitation rights.
Father can not complain about the delay of face-to-face visitation. It was the testimony of his expert which supported use of the delay period to aid the children. His argument the trial court erred by delaying his visitation rights without finding visitation would endanger the children's physical health or impair their emotional development is rejected.
The one year delay was not a "restriction" for purposes of the statute and it was reasonable. It applies an accepted and kindly approach to allow parent and child to be reacquainted after a pre-dissolution estrangement. Subsection 1 of § 402.400 RSMo Cum.Supp.1993 controls and not subsection 2 because the trial court's decree grants visitation rights rather than modifies already existing visitation rights. Even if subsection 2 was applicable, Mother's argument that § 402.400.2 requires a showing in this case of treatment and rehabilitation before the "restriction" on Father's visitation is removed fails for two reasons. First, the delay is not a statutory "restriction," it is preparatory of a present grant of unrestricted visitation. Second, the language in § 402.400.2 requiring such a showing is inapplicable because issues of abuse or domestic violence were not pleaded or tried. Therefore, a showing of proof of treatment and rehabilitation was not required before unrestricted visitation began. Mother's first point that the trial court erred in failing to require such showing in the future should be denied.
Mother argues the grant of unsupervised visitation with a future effective date was in error for another reason. She claims it was an invalid judgment which attempted to prospectively modify a final judgment without evidentiary support for a finding the modification would, at the time it was to take effect, promote the best interest and welfare of the children. She relies on several cases where a judgment attempted to automatically modify the custody arrangement upon the occurrence of a contingent future event. Rice v. Shepard, 877 S.W.2d 229 (Mo.App. W.D. 1994); Burch v. Burch, 805 S.W.2d 341 (Mo. *780 App.1991); and, Haldeman v. Haldeman, 685 S.W.2d 570 (Mo.App.1984). In Rice, primary physical custody would revert to the mother if she "move[d] from Iowa to a Missouri residence within thirty miles of Kansas City." Rice, 877 S.W.2d at 232. In Burch, the custody arrangement would not change "so long as [the mother] remains living with her parents." Burch, 805 S.W.2d at 343. In Haldeman, the mother would receive primary custody "at such time as [she] shall permanently relocate within the United States ..." Haldeman, 685 S.W.2d at 571. All of these cases involved an automatic modification of custody arrangements upon a contingent future event. The passing of one year in this case is not a contingent future event. Furthermore, Rice, Burch, and Haldeman involve a change in primary physical custody. Mother is complaining about a change in visitation rights where the court found she had actively shielded the children from their Father and prevented any contact, including telephone or mail communication.
Mother also argues the psychological counseling provisions of the decree are unduly vague and grossly inadequate to serve the purpose of preparing the minor children for visitation with Father at some time in the future. She argues the provisions are vague and inadequate because they do not require: (1) communication between or among counselors; (2) the issuance of formal or informal reports; and, (3) the presence or participation of counselors during the unsupervised visitation Father is to have one year after the entry of the decree. The success or completion of counseling was not a pre-condition or limitation on the starting date of Father's temporary custody and visitation rights. Accordingly, the counseling provisions constitute a request which both parties ignore at their peril. It is clear from the evidence and the decree that the trial court wanted the parties and the children to seek counseling for the sole purpose of helping the children to adapt to Father's absence for four years and his new identity. Consultation among counselors, or the issuance of reports may benefit the parties and the children and may occur but were reasonably thought to be unnecessary to the decree.
In her final point, Mother argues the trial court's award of joint legal custody is unsupported by substantial evidence, an abuse of discretion and a misapplication of the law because there was overwhelming evidence that Mother and Father now do not share any commonality of beliefs regarding the raising of the boys. Section 452.375.1(1) RSMo Cum.Supp.1993 provides:
"Joint legal custody" means that the parents share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child, and, unless allocated, apportioned, or decreed, the parents shall confer with one another in the exercise of decision-making rights, responsibilities, and authority;
Section 452.375.4 Cum.Supp.1993 provides,
... it is in the public interest to encourage parents to share decision-making rights and responsibilities of child rearing. In order to effectuate this policy, the court shall determine the custody arrangement which will best assure that parents share such decision-making responsibility and authority ... as is indicated in the best interests of the child under all relevant circumstances.
The statutory preference for joint custody "`is not that of a forced joint custody in order to induce the parents to find a common ground.' Rather, it is a preference `in favor of parents who show the willingness and ability to share the rights and responsibilities of child-rearing even after they have dissolved the marriage.'" (Our emphasis). In re Marriage of Johnson, 865 S.W.2d 412, 417 (Mo.App. S.D.1993)(citing Margolin v. Margolin, 796 S.W.2d 38, 49 (Mo.App.1990)). There must be substantial evidence to support an award of joint custody. Id. Where the record is devoid of substantial evidence that the parties have a commonality of belief concerning parental decisions and the willingness and ability to function as a unit in making those decisions, it is error for the trial court to award joint legal custody. Burkhart v. Burkhart, 876 S.W.2d 675, 680 (Mo.App. W.D.1994).
There was evidence to support a finding Mother and Father are not willing and able *781 to function as a parental unit in making decisions involving child rearing. Apart from Father's identity change, the ability to function as a parental unit will be hampered because of geography: Mother and children live in Missouri, Father lives in Virginia. Furthermore, Mother and Father have not acted as a parental unit for at least four years. This occurred originally by Father's choice and subsequently by Mother's restrictions on the children's contact with Father.
A review of the evidence, yields no substantial basis for a finding the parties have a commonality of belief concerning parental decisions or a willingness and ability to function as a unit in making those decisions. The record is devoid of any substantial evidence of Mother and Fathers' beliefs concerning parental decisions on education and health issues. The parties simply did not try the issue of joint legal custody to assist the trial court in following the relevant statute. The order granting joint legal custody is not supported by substantial evidence. I would remand to permit trial on that issue. The best interests of the children and the necessity for informed appellate review require the parties to present evidence to the fact-finder concerning their ability and willingness to function as a parental unit. In re Marriage of Johnson, 865 S.W.2d at 417.
Father argues in his cross-appeal, the trial court erred in ordering "[Father] shall not cohabit with other transsexuals or sleep with another female" during those periods in which the minor children are in his temporary custody. He argues this prohibition bears no relationship to the best interest and welfare of the minor children, is an undue hardship on him, and violates his constitutional rights. Father cites no cases to support his argument. His point violates Rule 84.04(d). If, as is the case here, the point is "one for which precedent is appropriate and available, it is the obligation of [Father] to cite such authority." Thummel v. King, 570 S.W.2d 679, 687 (Mo. banc 1978). A point of error unsupported by a citation of relevant, available authority is deemed abandoned. Earl v. St. Louis University, 875 S.W.2d 234, 240 (Mo.App. E.D.1994).
Even if Father had not abandoned his point, because of the nature of the issue, we could hold the trial court did not err in prohibiting Father from cohabiting with other transsexuals or sleeping with other women during the times when the children are in his custody. In J.P. v. P.W., 772 S.W.2d 786, 791-794 (Mo.App.1989) we discussed several Missouri cases involving the custodial and visitation rights of homosexual parents. We held that even when a two-year old child showed no ill effects from being exposed to homosexual behavior, "[t]he court does not need to wait ... till the damage is done." Id. at 792 citing N.K.M. v. L.E.M., 606 S.W.2d 179, 186 (Mo.App.1980). In P.L.W. v. T.R.W., 890 S.W.2d 688, 691 (Mo.App. S.D. 1994), we affirmed the trial court's order denying the mother's motion to modify the father's visitation rights because father had engaged in unusual sexual activities during the marriage. In the opinion, we noted that the father's actions had never occurred in the physical presence of the children. Id. at 692. I would adopt the analysis in J.P. v. P.W. In this case, the decree prohibits Father from cohabiting with a transsexual or sleeping with a female while the children are in his temporary custody. The prohibition is directed to behavior which would occur in the children's presence.
The decree should be affirmed in all respects except the award of joint legal custody.
NOTES
[1] D.K.S. n/k/a S.D.S. has undergone male to female "sex-reassignment" surgery. We will use the term "Father" to refer to D.K.S. n/k/a S.D.S. throughout the opinion. Father objected during the trial to any usage of male pronouns to describe Father. To avoid confusion and not out of any disrespect for Father's wishes, we will use pronouns applicable to the parties when their children were born.