**In re the MARRIAGE OF Robert Murray BENNETT and Marie Jerline Bennett.**

**Robert Murray BENNETT, Petitioner–Respondent,**

v.

**Marie Jerline BENNETT, Respondent–Appellant.**

**No. 20572.**

Missouri Court of Appeals, Southern District, Division One.

Feb. 28, 1997.

Ralph W. Muxlow, II, Richland, for respondent–appellant.

James D. Sickal, Waynesville, for petitioner–respondent.

GARRISON, Judge.

In this dissolution of marriage action, Marie Bennett (Mother) appeals from a decree that awarded primary custody of their only child (Jonathan) to Robert Bennett (Father), and ordered her to pay child support of $500 per month. We affirm.

The applicable standard of review in a court-tried case requires that the judgment be affirmed if it is supported by substantial evidence, it is not against the weight of the evidence, and it neither erroneously declares nor applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). In reviewing the record on appeal, "[w]e accept as true the evidence and inferences therefrom that are favorable to the trial court's decree and we disregard all contrary evidence." *Chapman*

*v. Chapman,* 871 S.W.2d 123, 124 (Mo.App. E.D.1994). Viewed in that light, the pertinent facts in this case are as follows:

Mother and Father were both on active duty in the military at Fort Leonard Wood, Missouri, when they were married on March 11, 1989. Four months after their marriage, Mother was assigned to Honduras for six months, and Father remained at Fort Leonard Wood and cared for Mother's children from two earlier marriages (Daniel, born November 14, 1973, and Travis, born January 29, 1979).[1]

After discussions in February, 1991, the parties decided that Father would accept an optional one-year tour of duty in Korea. In preparation for that assignment, he was transferred to Fort Benning, Georgia, in May, 1991, and left for Korea in August. Father remained in Korea until November, 1991 when he submitted his resignation from the service and was shipped to Hawaii to be "processed" out. While in Hawaii, Father was notified that Jonathan had been born on November 28, 1991, nine weeks prematurely.

Father eventually received a "compassionate reassignment" to Fort Leonard Wood in the middle of January, 1992 so he could be with his family while he was being processed out of the army. Jonathan was released from the hospital at the end of January, and in March, Mother returned to work. Father, who took advantage of leave he had accumulated while on active duty, was then able to stay at home with Jonathan.

Mother volunteered for a one-year unaccompanied tour of duty in Korea.[2] In preparation for that tour, she left for Fort Benjamin Harrison in July, 1992, and left for Korea in August. Father remained in Missouri, caring for Travis and Jonathan, who was then eight months old.

During her one-year tour, Mother came home once, in February, 1993, on a fifteen-day leave. In August, 1993, she finished her tour in Korea and returned home, informing Father that she had volunteered for a three-

---

1. The relationship between Father and Daniel later became strained and Daniel eventually moved to Virginia to live with Mother's parents.

2. An "unaccompanied" tour of duty means that it is to be without family members.

year tour in Japan. During their discussions, Father indicated that he did not want to move to Japan. Mother said that she had anticipated that decision, and told Father that in fact she did not want him to move to Japan, preferring instead that they spend time apart. Mother left for Japan on September 1, 1993, about fifteen days after returning from Korea, and again left Jonathan with Father.[3]

Father filed this dissolution action in Pulaski County in February, 1994, requesting that the court award him primary physical custody of Jonathan. In April, 1994, Father and Jonathan moved to Florida. According to Father, Mother suggested such a move prior to her departure so that he and Jonathan would be closer to his family who resided there.

Mother did not receive an anticipated promotion, and she voluntarily separated from the military in July, 1994. When she returned to the United States, she filed an answer and counterclaim in which she also sought a dissolution of their marriage and primary physical custody of Jonathan. She also accepted a six-month contract to work for General Dynamics in Troy, Michigan.

Following trial of the case on December 5 and 6, 1994, the court dissolved the marriage but took all other issues under advisement. On January 3, 1995, Mother filed a motion to reopen the evidence or, in the alternative, a motion to modify the judgment pursuant to Supreme Court Rule 75.01. The motion was noticed up for hearing on January 12, at which time the trial court overruled the motion to reopen the evidence. According to Mother's brief, the trial court did not rule on the motion to modify the judgment because a judgment had not yet been entered.

On September 6, 1995, the trial court advised the attorneys of its preliminary findings and entered its formal judgment on September 15, 1995.[4] On October 3, 1995, Mother filed an amended motion pursuant to Rule 75.01 requesting the trial court to modify its judgment. On October 6, 1995, the trial court, over Father's objections, heard Mother's amended motion and amended the judgment to show Missouri as Mother's residence, but otherwise denied it. Mother appeals the trial court's amended judgment.

### POINT I

In her first point on appeal, Mother contends that the trial court erred in awarding primary physical custody of Jonathan to Father. She argues that the judgment was contrary to the greater weight of the evidence, contrary to the child's best interests, and constituted an abuse of discretion.

In reviewing an award of custody, we are mindful that "an appellate court will not disturb a trial court's custody award unless it is manifestly erroneous and the welfare of the child requires some disposition other than that made by the trial court." *In re Marriage of V—A—E—*, 873 S.W.2d 262, 266 (Mo.App. S.D.1994). It is presumed the trial court awarded custody in accordance with the child's best interests, because of the trial court's superior position in judging credibility of the witnesses, along with their character, sincerity, and other intangibles which might not be completely revealed by the record. *Sinopole v. Sinopole*, 871 S.W.2d 46, 48 (Mo.App. E.D.1993). We are mindful that in reaching its decision the trial court is free to believe or disbelieve all, part or none of the testimony of any witness. *In re Marriage of Campbell*, 868 S.W.2d 148, 150 (Mo. App. S.D.1993). Therefore, we afford greater deference to the trial court's decision in child custody determinations than in other cases. *Cornell v. Cornell*, 809 S.W.2d 869, 873 (Mo.App. S.D.1991). We should exercise the power to set aside a child custody decree on the ground that it is against the weight of

3. Travis went to Japan to join Mother about a month later.

4. Nine months elapsed from the date of trial to entry of the decree. While we recognize that congested trial court dockets may result in some delays in entering judgments in court-tried cases, such delays should be minimized when possible, especially in cases involving issues such as the instant case. We find it difficult to imagine a situation where a trial court would be justified, especially in a case involving child custody, in taking nine months to issue its decree. Such delays do little to enhance public confidence in the judiciary. *In re Marriage of Short*, 847 S.W.2d 158, 163 (Mo.App. S.D.1993).

the evidence with caution and with the firm belief that the decree or judgment is wrong. *In re Marriage of Campbell,* 868 S.W.2d at 153.

Section 452.375.2, RSMo 1994, mandates that custody decisions be made in accordance with the best interests of the child. The legislature has established eight factors which must be considered in determining the child's best interests. *Hamilton v. Hamilton,* 886 S.W.2d 711, 714 (Mo.App. W.D. 1994). The eight factors of § 452.375.2 include the following:

(1) The wishes of the child's parents as to his custody;

(2) The wishes of a child as to his custodian;

(3) The interaction and interrelationship of the child with his parents, his siblings, and any other person who may significantly affect the child's best interests;

(4) The child's adjustment to his home, school, and community;

(5) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved; ...

(6) The needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(7) The intention of either parent to relocate his residence outside the state; and

(8) Which parent is more likely to allow the child frequent and meaningful contact with the other parent.

As to factor (1), both Mother and Father clearly expressed their desire to have primary physical custody of Jonathan. Factor (2) was not relevant because Jonathan was only three years old at the time of trial. As to factor (3), there was evidence that Jonathan appeared more comfortable with Father than with Mother, and that a close bond had been established between Jonathan and Father. Due to Jonathan's age, factor (4) is not relevant here. As to factor (5), the evidence showed that Father had been hospitalized in 1991 for what was described as major depression, but there was no evidence that he had any continuing problems of that nature, or that any physical or mental condition of Father had any adverse impact on Jonathan. As to factor (6), Father showed an "ability and willingness ... to actively perform" his function as father for the needs of the child by acting as Jonathan's primary, if not sole, caretaker since he was six months old. As to factor (7), the trial court found that "there is no evidence to indicate [Father's] move to Florida with the child was for the purpose of denying [Mother] visitation and contact with the child, nor has it had that effect. The Court finds that the move to Florida was for the purpose of finding full time employment to enable [Father] to provide for the child's support." Finally, as to factor (8), both parents expressed a desire for the other parent to have frequent and meaningful contact with Jonathan.

"[T]his court is presented with the review of a case involving that most difficult question—which of two competing parents should have custody of children. It is axiomatic to say the question must be answered not on the basis of a reward to or punishment of either parent. The ultimate and sole test is what will be in the best interests of the children." *Knoblauch v. Jones,* 613 S.W.2d 161, 165 (Mo.App. S.D.1981) (citations omitted).

Both Mother and Father made accusations about the other at trial. Although the trial court granted joint legal custody after finding that both were fit and proper persons to share in Jonathan's custody, it concluded from the evidence and recommendations of the guardian ad litem appointed for Jonathan[5] that the child's best interests and welfare would be served by awarding primary physical custody to Father. It also ordered that Mother should have "reasonable and certain specific visitation on a graduated ba-

---

5. The guardian ad litem reported to the court, among other things, that Father had at times been irresponsible with finances, and that Mother was so career oriented that it seemed to have caused a problem. He concluded, however, that although he could not say that either Mother or Father were bad parents, he thought it best for Jonathan to stay with Father "until he gets a chance to know his mother a little better."

sis so that the child and [Mother] can establish a relationship."

Following a careful examination of the record, we are not firmly convinced that the child's best interests and welfare require some other disposition and, as a result, we are unable to find that the trial court abused its discretion in awarding primary physical custody of Jonathan to Father. Mother's first point is therefore denied.

### POINT II

In her second point on appeal, Mother alleges that the trial court's order requiring her to pay child support of $500 per month was contrary to the evidence, not supported by substantial evidence, and erroneously applied the law. In support, she argues that her income was permanently and involuntarily reduced after the trial, and that the court failed to give her credit for other children in her custody as indicated on line 2c of Form 14.

■ Initially, we note that the trial court has broad discretion in setting child support awards. *Holmes v. Holmes,* 878 S.W.2d 906, 909 (Mo.App. E.D.1994). An appellate court will not substitute its judgment for that of the trial court absent a manifest abuse of discretion, and will not disturb a child support award unless the evidence is "palpably insufficient" to support it. *Id.*

The first prong of Mother's point is based on the fact that her job in Michigan ended in January, 1995, resulting in a decrease in income which she alleges was involuntary and permanent. At trial, she testified that her job in Michigan, which commenced on July 11, 1994, was for only six months and was scheduled to terminate in January, 1995, although she was hopeful that it would be extended. In her January 3, 1995 motion to reopen the evidence or, in the alternative, to modify any judgment which the court might enter pursuant to Rule 75.01, Mother alleged that since the trial she had learned that her job in Michigan was being terminated that month, and consequently she had made the decision to relocate to Missouri. She also alleged that she was seeking employment

and "will be able to inform the court of her employment, if any, at such time as this matter is heard by the court." The trial court's docket sheet contains an entry on January 12, 1995 that "Motion to reopen is overruled. Case taken under advisement."

In Mother's amended Rule 75.01 motion, filed on October 3, 1995 after the judgment was entered, she alleged that she had been employed in Missouri since January, 1995, but that it was part time with an average monthly income of $2,576, and she requested the trial court to conduct a hearing and "make changes in the judgment ... consistent with the evidence presented." She argues that the evidence presented in support of this motion established that her income had decreased from $3851 per month, which she was earning at the time of trial, to $2576, and that the decrease was permanent and involuntary.

■ Mother's contention in this portion of the point is, therefore, based on the failure of the trial court to amend its judgment as to the child support award, based on the allegations of her amended Rule 75.01 motion and the evidence she presented in support of it. It is, therefore, necessary that we review the nature of such motions.

In pertinent part, Rule 75.01 provides that "[t]he trial court retains control over judgments during the thirty-day period after entry of judgment and may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, correct, amend, or modify its judgment within that time."

The logic and justice of Rule 75.01 was described in *State ex rel. Schweitzer v. Greene,* 438 S.W.2d 229, 232 (Mo. banc 1969), where the court said that "a trial court should be permitted to retain control of every phase of a case so that it may correct errors, or, in its discretion, modify or set aside orders or judgments until its jurisdiction is extinguished by the judgment becoming final and appealable." The purpose of Rule 75.01 is to permit the trial court to rectify any errors in the judgment, and thus simplify or forestall any further litigation at the appellate level. *In re Marriage of Short,* 847 S.W.2d at 162.

▉ Rule 75.01 requires a showing of "good cause," which eludes a precise definition, but refers to a remedial purpose and is to be applied with discretion to prevent a manifest injustice or to avoid a threatened one. *In re Marriage of Gormley*, 813 S.W.2d 108, 111 (Mo.App. S.D.1991); *B__L__C __(K) v. W__ W__ C__*, 568 S.W.2d 602, 605 (Mo.App. W.D.1978). The trial court has considerable discretion in ruling such motions, and an appellate court should not reverse its decision unless there has been an abuse of that discretion. *Corzine v. Stoff*, 505 S.W.2d 162, 164 (Mo.App. E.D.1973).

▉ Because of due process requirements, notice is a condition precedent for the court to act under Rule 75.01. *Couch v. Couch*, 824 S.W.2d 65, 69 (Mo.App. W.D.1991). This requires that the parties receive reasonable notice and an opportunity to be heard. *Summers v. Clayton*, 500 S.W.2d 28, 30 (Mo.App. W.D.1973).

In the instant case, Mother's amended motion was filed on October 3, 1995, together with a notice calling it up on October 5. Father's attorney, however, did not receive the amended motion and notice until October 5 and was unable to appear at that time. The amended motion was taken up on October 6, over the objection of Father's attorney that he had not received reasonable notice, was not prepared for a hearing on the matter, and that Father, who was living in Florida, could not be there. He also objected that the amended motion was in the nature of a motion to modify, and if it was heard that day, they would not have a reasonable opportunity for discovery and to prepare for the hearing.

The trial court proceeded to conduct a hearing on the amended motion, which included testimony from Mother and a psychotherapist who had seen Mother and Jonathan twice in the previous week.[6] Mother's testimony concerning the child support issue was that her job in Michigan had terminated in January, 1995, as she had anticipated at the time of trial, and her income had been reduced. She said that she was then working part time for the National Guard in Missouri and that she had also been hired as a substitute teacher. While she testified that her average monthly income since January had been $2576, she presented no evidence concerning what income she anticipated from teaching or what prospects she might have for regaining the earning level she had at the time of trial.

In denying Mother's motion, the trial court noted that it had only thirty days within which to grant any relief under such motions, and that the notice here was so short that Father was unable to attend the hearing. The trial court also reminded Mother that she had other remedies available to her, including a motion to modify. Under these circumstances, the trial court did not abuse its discretion in failing to amend the judgment by decreasing the child support on the basis of Mother's alleged decreased income.

▉ Mother also contends that the trial court erred in establishing her child support obligation at $500 per month because it failed to give her credit for children in her custody as provided by line 2c of Form 14.[7] Each of the parties filed Form 14's with the trial court. None of them, including the two filed by Mother, requested or suggested a credit on line 2c for children in Mother's custody. The trial court rejected those Form 14's and formulated its own, also without a credit for Mother on line 2c. The first time Mother made a request for such a credit was in her amended Rule 75.01 motion.

"A party will not be heard to complain on appeal of an alleged error in which, by his own conduct at the trial, he joined or acquiesced." *In re Marriage of Short*, 847 S.W.2d at 167. The party is bound by the

---

6. Mother was also requesting the trial court to modify the child custody portion of the judgment.

7. Mother only argues that she should receive credit for Travis. Daniel turned twenty-two on November 14, 1995 and is therefore emancipated since he was a full-time student at the time.

Mother's child support obligation began on September 1, 1995, but she does not ask for credit for Daniel before his emancipation, namely from September 1, 1995 until November 14, 1995. We will only address the relief sought by Mother in her brief on appeal.

position he took in the trial court. *Id.* "A party cannot lead a trial court into error and then employ the error as a source of complaint on appeal." *Canania v. Director of Revenue,* 918 S.W.2d 310, 315 (Mo.App. S.D. 1996); *see also In re Marriage of Collins,* 875 S.W.2d 643, 648 (Mo.App. S.D.1994). For these reasons, as well as the lack of sufficient notice discussed above, the court did not err as alleged in this portion of the point.

Point II is denied. The judgment is affirmed.

BARNEY, P.J., and PREWITT, J., concur.