**Mark Randall TRACY, Petitioner–Respondent,**

v.

**Carolyn Sue TRACY, Respondent–Appellant.**

No. 21531.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 13, 1998.

Kay S. Graff, Springfield, for Appellant.

Richard L. Schnake, Neale & Newman, L.L.P., Springfield, for Respondent.

BARNEY, Judge.

Carolyn Sue Tracy (Wife) appeals from a decree dissolving her marriage to Mark Randall Tracy (Husband). The parties were married on September 4, 1985. Their union produced two children: Joshua Aaron Tracy, born July 15, 1992, and Jarrod Adam Tracy, born April 6, 1994.

Husband filed a petition for dissolution of marriage on June 24, 1994, in which he sought primary physical custody of both children and an equitable distribution of marital property and allocation of debts. A temporary custody order was entered on July 15, 1994, splitting custody of the two children between each parent.[1]

The first trial of this matter occurred before Commissioner Scott B. Tinsley of the Greene County Family Court. Commissioner Tinsley entered a "judgment and decree of dissolution of marriage." With regard to child custody, it provided:

> That the parties are each fit and proper persons to have the custody, care and control of the minor children of the marriage and that the parties shall have joint legal custody of the children. The Court further finds that the primary physical custody of JOSHUA AARON TRACY shall be placed with [Husband] and the primary physical custody of JARROD ADAM TRACY shall be placed with [Wife]. . . .

On September 22, 1995, Husband filed a motion for reconsideration, which was denied by the family court commissioner. Husband then filed a motion for hearing before the judge of the family court in which he alleged that splitting custody of the children was contrary to their best interests.[2] Husband's motion was sustained.

■ A second trial of this matter then commenced before Associate Circuit Judge J.

---

1. The temporary order granted Husband primary physical custody of Joshua and granted Wife primary physical custody of Jarrod.

2. See § 487.030.2, RSMo Cum.Supp.1996. "The parties to a cause of action heard by a commissioner are entitled to file with the court a motion for a hearing by a judge of the family court. . . ." *Id.*

Dan Conklin. On January 24, 1997, the trial court entered its judgment and decree of dissolution of marriage wherein it divided the marital and non-marital assets between the parties and awarded primary physical custody of both children to Husband.[3] The trial court ordered Wife to pay child support to Husband in the sum of $100.00 per month for each child. No maintenance was awarded.

On appeal of the judgment and decree of dissolution of marriage, Wife assigns four points of trial court error. First, she avers that the trial court abused its discretion in awarding primary physical custody of the two children to Husband because its decision was against the manifest weight of the evidence and was contrary to the law in that the children's best interests "would be better served by an award of joint legal and physical custody with approximately equal time with each parent." Second, Wife avers that the trial court's award of child support was not supported by substantial evidence because it exceeded the amount of the Form 14s presented to the court without a statement as to how it was calculated. Third, she avers that the trial court erred in its division of the marital assets in that its decision was against the manifest weight of the evidence because the "valuations adopted by the court were supplied by a non-owner, non-expert witness, the debts were not supported by evidence and the decree is not complete." Fourth, Wife asserts that it was trial court error to not order Husband to pay her attorney's fees.

The trial court's decree must be affirmed if it is supported by substantial evidence, it is not against the manifest weight of the evidence, and it neither erroneously declares nor applies the law. *J.L.S. v. D.K.S.*, 943 S.W.2d 766, 769 (Mo.App.1997). We must accept as true the evidence and permissible inferences therefrom in the light most favorable to the decree and disregard all contrary evidence and inferences. *Id.* Where there is a conflict in testimony, we defer to the trial court's determination of the credibility of the witnesses. *Id.*

**3.** We note that "[a]bsent unusual circumstances, siblings should not be separated upon divorce."

## I.

In Wife's first assignment of error, she avers that the trial court erred in awarding primary physical custody of both children to Husband.

The Missouri legislature has established eight factors which must be considered by the trial court in determining custody in accordance with the best interests of the child:

(1) The wishes of the child's parents as to his custody;

(2) The wishes of a child as to his custodian;

(3) The interaction and interrelationship of the child with his parents, his siblings, and any other person who may significantly affect the child's best interests;

(4) The child's adjustment to his home, school, and community;

(5) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm;

(6) The needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(7) The intention of either parent to relocate his residence outside the state; and

(8) Which parent is more likely to allow the child frequent and meaningful contact with the other parent.

§ 452.375.2, RSMo Cum.Supp.1996.

The trial court is vested with broad discretion in determining child custody and our principal concern, as is the trial court's in awarding custody, is the best inter-

*Replogle v. Replogle*, 903 S.W.2d 551, 554 (Mo. App.1995).

ests of the children. *J.L.S.*, 943 S.W.2d at 775. In determining the best interests of the children, the court may consider the conduct of the parents. *Id.; In re Marriage of Campbell,* 868 S.W.2d 148, 153 (Mo. App.1993). There must be consideration of what conduct a parent may inspire by example, or what conduct of a child a parent may foster by condonation. *J.L.S.*, 943 S.W.2d at 775. Past and present activities may be a reliable guide to the priorities of the parent. *Id.; M. v. M.*, 688 S.W.2d 384, 386 (Mo.App. 1985). Consideration of conduct is not limited to that which has in fact detrimentally affected the children. *J.L.S.*, 943 S.W.2d at 775. We presume the trial court awarded custody in accordance with the children's best interests. *In re Marriage of Bennett,* 938 S.W.2d 952, 954 (Mo.App.1997). Appellate courts afford greater deference to a trial court's decision in child custody determinations than in other cases. *Id.*

■■■ The trial court's judgment and dissolution decree delineated a "Joint Custody Plan," which awarded Husband "primary physical custody" of both minor children. The trial court awarded Wife reasonable, frequent and meaningful visitation, specifically outlined in the trial court's decree. It generally provides, *inter alia*, that Wife will have alternating weekend visitation with the children, one weekday of visitation per week (*see* note 4, *infra*), an extended period of temporary custody during the first half of the summer "school vacation period," and during each holiday or vacation she shall have visitation on alternating odd-numbered and even-numbered years, depending on the particular occasion.[4] Wife was also awarded a similar

visitation schedule with regard to the children's respective birthdays. Husband was awarded custody during times not otherwise specified in the dissolution decree.

Husband and Wife were awarded identical rights with regard to decision-making relating to the children's health, medical treatment, education, religious training, and welfare. Husband, as the primary custodian, was awarded primary decision-making authority in the event of a conflict.

Considering the foregoing, we conclude that the trial court's decree with regard to child custody would more accurately be interpreted as having awarded Husband and Wife "joint physical custody," as opposed to having awarded Wife merely a right of "visitation."[5] Thus, Wife's point one will be considered as contending that the joint custody order's allocation of time when the child resides with each parent or under each parent's care and supervision was contrary to the children's best interests. *See Francka v. Francka,* 951 S.W.2d 685, 689 (Mo.App.1997); *Rinehart v. Rinehart,* 877 S.W.2d 205, 207 (Mo.App.1994). The custody plan in the trial court's dissolution decree satisfies the definition of "joint physical custody" as provided in section 452.375.1(2).[6] *See id.;* note 5, *supra.*

There was detailed testimony adduced at trial regarding the interrelationships between the children and Husband and between the children and Wife. There was also detailed testimony regarding the conduct of Wife as it related to the breakdown of the marriage.

As to the deterioration of the marriage, we need not recount all the details leading to its

---

4. The trial court defined "weekends" as follows:
*Before the oldest child enters School:* Alternate weekends from 8:00 a.m. on Thursday until 8:00 p.m. on Sunday, commencing the first weekend after entry of the decree herein and from 8:00 a.m. on Thursday until 3:00 p.m. on Friday during the week mother does not have weekend visitation.
*After the oldest child enters School:* Alternate weekends from Friday at 5:00 p.m. until Sunday at 8:00 p.m., and from 5:00 p.m. to 8:00 p.m. on Thursday during the week mother does not have weekend visitation.

5. *See* § 452.375.1(2), RSMo Cum.Supp.1996. "**Joint physical custody**" means an order award-

ing each of the parents significant periods of time during which a child resides with or is under the care and supervision of each of the parents. *Id.* A non-custodial parent's right to "visitation" is defined in § 452.400, RSMo Cum. Supp.1996.

6. This Court acknowledges that pursuant to the trial court's dissolution decree the children will reside primarily with Husband and that in the event of a conflict with regard to decision-making, Husband will have the overriding authority. Our opinion herein should not be construed as having disturbed the trial court's dissolution decree in that regard.

demise. Suffice to say that during the course of the marriage Wife began an adulterous affair with Mr. Steve Dukes and that such affair led to her voluntarily moving from the parties' home so that she could begin residing with her paramour.

Several witnesses testified during the trial regarding the relationships between the children and the respective parties.

Husband presented expert testimony from Dr. Roy Grando, who holds a Ph.D. in Human Development and Family Studies. Dr. Grando testified that he administered certain tests to Husband, including the Multi–Minnesota Multiphasic Personality Inventory II, the MMPI II, and the Millon Clinical Multiaxial Inventory. He stated that those are personality tests designed to reveal things about a person's emotions and personality, whether the person is in acute distress, has anxiety, depression, and whether the person has any kind of substance abuse problems. Dr. Grando testified that Husband's results on these tests were within "normal" limits.

Dr. Grando also testified that he interviewed Husband and his children by themselves and all together and observed their interactions. He stated that "[t]he children together did very well. Their relationship was very good, and there was not any conflict even when both of the children were interested in the same toys." Dr. Grando further stated that "when their father was with them, both before and after seeing them by themselves, they were very close to him, showed him a lot of attention. He interacted with them well. They looked to him for guidance at times." Dr. Grando opined that the "children were both bonded to him."

Dr. Grando was asked whether, in his professional opinion, he believed it was appropriate for the children to refer to Wife's "live-in paramour" as "Daddy."[7] He responded

I don't think it's appropriate. I think it's negative for the child's identity, because each parent is a very important factor to the individual development of the child.

And if the child gets confused about who the father is or that he may have more than one father, then that can cause psychological problems.

Dr. Grando was also questioned regarding this issue by the children's Guardian Ad Litem[8] as follows:

Q. If—I think Mr. LeCompte asked you questions about a child referring to his mother's paramour as father or Daddy Dukes or some term like that, and you said that that could be confusing; is that correct?

A. Yes.

Q. What would that say about a parent who did not understand why this might be of a concern to the other parent?

A. It might say that the parent doesn't realize the importance of the paternal relationship and—and thinks there can be substitutes. But each child only has one mother and one father.

Q. Would that show a lack of insight into the feelings of the child?

A. Yes. Yes, it would.

Q. And would it show a lack of insight into the feelings of the father in this situation?

A. Yes, it would.

Husband presented four other witnesses to testify regarding his relationship with his children. Mr. Leonard Rapp was a longtime neighbor of Husband's who regularly observed Husband interact with his children. Mrs. Norma Carol Tracy, Husband's mother, also testified regarding the level of Husband's parenting skills. The other two witnesses were long-time mutual friends of Husband and Wife. Ms. Terri Ann House testified that she was a close friend of Husband and Wife for approximately eight years prior to their separation. Ms. House stated the she and her husband were with Husband and Wife approximately three or four times per week over an eight-year period. Ms. Theresa Chenault testified that she was a close friend of Husband and Wife for approx-

---

**7.** We note that there was testimony suggesting that the children were taught to refer to Wife's live-in paramour as either "Daddy" or "Daddy Dukes." *See* discussion, *supra*.

**8.** The children's Guardian Ad Litem was appointed pursuant to § 452.423.1, RSMo Cum.Supp. 1996.

imately six years prior to their separation. Ms. Chenault testified that she and her husband would see Husband and Wife two or three times per week and would "go out on weekends together, do things."

Mr. Rapp stated that Husband "does a good job taking care of those children." He testified that his grandchildren and Husband's children often play together and attend birthday parties together. He related that when the children are with Husband that he will "see him about every day. He's out in the yard playing with them." Mr. Rapp testified that Husband maintains a swing set in his backyard and "little battery-operated cars" that Husband's children and his grandchildren often play with. Mr. Rapp testified that Husband maintains his home and yard very clean.

Mrs. Tracy testified that Husband prepares the children well-balanced meals, including "chicken grilled outside, also fixed inside, steaks, chicken cordon bleu. He fixes beans and ham and cornbread, stir fry. And this is usually fixed from scratch." She also testified that Husband prepares fruit, vegetables and milk for the children. On the other hand, Mrs. Tracy testified that Wife never cooked for the children, relying primarily on "McDonald's or Taco Bell or Kentucky Fried Chicken." Mrs. Tracy also related to the trial court that Wife had expressed to her that it made her feel "uncomfortable" to wash Joshua's penis and that therefore she refrained from properly bathing him.[9]

Ms. House testified that "there's a big difference" between how Husband cared for the children and how Wife cared for the children. Ms. House stated that Husband's home is a "[v]ery neat home ... very clean." She said that Husband prepares nourishing, well-balanced meals for the children. She also testified that Husband often takes the children fishing and that he often plays with them in their backyard. With regard to Wife's parenting skills, Ms. House testified that Wife had told her that at night she would give Joshua aspirin "to knock him out" when he would not want to go to bed. Ms. House also testified that when the children were hungry, Wife would "just pop a TV dinner in the microwave and heat it up...." She testified that Wife appeared detached when dealing with the children.

Ms. Chenault related to the trial court that when she arrived at the party for Joshua's second birthday, she discovered that Wife was absent from the festivities. She stated that later, when Wife dropped Jarrod off at the birthday party, she left "no bottle, no water, no nothing."

Ms. Chenault testified that Husband "was the one who was most attentive towards [the children]. He would go out and play with them ... and go and check on them ... to make sure they were all right, you know, where you're in the house." She testified that Husband's home is "immaculate." In characterizing Wife's relationship with the children, Ms. Chenault stated that Wife viewed caring for the children as "a job." She testified that Wife does not cook and that every time she was with Wife that she would feed the children "Taco Bell or any fast food or TV dinners." Ms. Chenault testified that Husband cooked nutritional meals for the children.

Husband testified, *inter alia*, that in order to get Joshua to sleep at night, Husband remembered occasions when Wife would give him a dose of aspirin and would say "I'll just knock his ass out with aspirin." [10]

He also testified that Wife "absolutely does not cook, never—never has." He said that Wife resorts to buying fast food to feed the children. Husband testified that he, on the other hand, prepares meals for the children, including chicken, vegetables, salads, fruits, and stir fry.

---

**9.** With regard to this issue, we note that Ms. House and Ms. Chenault corroborated Mrs. Tracy's testimony. They each testified that Wife has previously expressed a desire to refrain from washing Joshua's penis. Indeed, Wife herself testified that "I'm not for sure how you're supposed to take care of [a penis], being's [sic] I've never had one before to take care of."

**10.** Husband testified that when Wife was administering aspirin to Joshua to facilitate his sleeping that he "was in other parts of the house. She would tell me after she did it." He stated that he did not want to "hide" any medication from Wife because there would be occasions when Joshua would really need it.

Husband testified that Wife taught the children to refer to her live-in paramour as "Daddy." He stated that he is opposed to his children referring to this man as "Daddy" and that he believes it is an attempt by Wife to alienate him from the children. Husband also related that he maintains a close relationship with his family and that the children are actively involved with his parents. He testified that Wife has a "volatile" relationship with her family.

Wife presented nine witnesses, six of whom were customers of Wife's hair-styling business. None ever observed the children with Husband and Wife together.

Ms. Sherry Thurston testified that she had known Wife for about one year and stated that the children "seem to be very loving toward her. They're always on her lap or wanting Mommy to play this or Mommy to play that. They're typical toddlers." She described Wife's residence as a "small, two bedroom home with a nice backyard that's fenced for the children to play in."

Ms. Jo Ann Bishop testified that she had known Wife for approximately seven months. When asked how she became acquainted with Wife, Ms. Bishop responded that "[s]he came to [my house] to do my hair." She testified that on one occasion she went to Wife's house for a hair appointment and that she observed that Wife's "house is very neat, very lived in, but very neat. There was children there. They had plenty of toys, plenty of food, and I saw absolutely nothing wrong with it."

Ms. Anita Shirkey testified that she had known Wife for approximately seven months. She said that she had been in Wife's home two or three times and that Wife's home was "very clean, because I know that she took care of children and—and everything. And I noticed that there wasn't no toys or anything in the—in the way. There was always everything in its perspective."

Ms. Judy Coiner is employed as a parent-educator with the Springfield Public Schools. She testified that she met with Wife and Joshua four times during the twelve months preceding her testimony. Ms. Coiner testified that she performs developmental screening for children. She also stated that her job is to assist parents in gaining better parenting skills. She testified that Joshua's screening revealed that he was "age appropriate."

Ms. Vickie Wester testified that she had known Wife for approximately nine years but never visited Husband and Wife's home during their marriage. She stated that she has visited Wife's home since the parties' separation and that Wife is "a very patient mother, and she loves her children." She also testified that the children refer to Wife's live-in paramour as "Daddy Dukes" and "Daddy."

Ms. Andrea J. Sturgis is a licensed professional counselor. She testified that she met with Wife for a total of twelve hours during twelve separate visits. On one of those visits she met with Wife and her children together and on another occasion she met with Wife and her "blended family," including Mr. Dukes and his children. Ms. Sturgis did not administer any psychological tests to Wife. She stated that she specializes in "brief therapy." Ms. Sturgis testified, *inter alia*, that in her professional opinion Wife was a fit parent. She also testified that Wife related to her that she preferred to maintain the current custody plan, which split primary physical custody of the two children between Husband and Wife.

Wife testified that her marriage to Husband was dead from the beginning and that it was a big lie. Wife told Ms. House that her marriage to Husband "was a big lie, that she'd never loved him, that it was all just a big old act." Wife testified that she moved out of the parties' residence at approximately 2:00 a.m. on June 24, 1994. Wife said that she was prompted to leave on that occasion because "I just got this feeling that [Husband] might have known about Steve and I, somehow or other might have found out that Steve and I might have been together, you know. So I went to the phone, and I called Steve and I asked him to come and get me." When Husband asked Wife about who she had called, she testified that she told him "[y]ou'll know in 10 to 15 minutes." Husband testified that "I thought I was having a nightmare." Shortly thereafter, Mr. Dukes arrived and after a brief argument regarding the children, Husband permitted Wife to

take Jarrod with her because she was still breast feeding him.

When asked how the children refer to her live-in paramour, she testified that "[t]hey either use Daddy Dukes, or they use Dukes." Wife testified that "I don't see this as a problem simply because I've got three other boys in the home that refer to Steve as Daddy ... Steve is just the daddy in our home. We have a mommy and we have a daddy in our home, you know." [11] Furthermore, with regard to the children referring to Wife's live-in paramour as "Daddy," she stated that "I don't discourage it."

With regard to Wife's ability to provide a positive moral model for her children, the following colloquy occurred between Wife and Husband's counsel on cross-examination:

Q. As far as your beliefs in things such as adultery, living out of wedlock, lying, the necessity for truthfulness? Do you think you can impart those kind of values to these children?

A. Living out of wedlock cannot be stopped till this divorce is settled. There are some of the morals that, after this divorce is over with, can be set up; and I can make a better example for my children. No, I probably am not the best example for my children as it stands right now.

Wife also testified that she preferred to maintain the existing custody arrangement, which would permit Jarrod to reside with her and Joshua to reside with Husband.

As noted heretofore, where there are conflicts in testimony, we defer to the trial court's determination of the credibility of the witnesses. *J.L.S.*, 943 S.W.2d at 769.

Based upon our review of the trial court's dissolution decree regarding child custody, we presume that it found that Husband and Wife were each fit and proper persons to share in their two children's custody. Each parent has been awarded significant periods of time during which the children will reside with them. Upon our careful examination of the record in this matter and the factors enumerated in section 452.375.2, we conclude that the allocation of time that Wife was allotted with the children pursuant to the trial court's dissolution decree is supported by substantial evidence. *See Gant v. Gant*, 923 S.W.2d 527, 531 (Mo.App.1996). Thus, this Court does not have a "firm belief" that the decree of the trial court with regard to child custody is wrong, and it has not been demonstrated that the trial court's joint custody plan was against the weight of the evidence. *See T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989). Point I is denied.

## II.

In Wife's second assignment of error, she maintains that the trial court erred in computing the amount of her child support obligation "because it exceeded the amount of the Form [14s] presented to the [trial] court by [Husband] without statement as to how calculated and that [Husband's] Form 14 understated [his] income."

The trial court has broad discretion in setting child support awards. *In re Marriage of Bennett*, 938 S.W.2d at 956; *see also Buckner v. Jordan*, 952 S.W.2d 710, 712 (Mo. banc 1997). An appellate court will not substitute its judgment for that of the trial court absent a manifest abuse of discretion, and will not disturb a child support award unless the evidence is "palpably insufficient" to support it. *Id.*

Wife testified that she was capable of working a minimum of forty hours per week at the minimum hourly wage and stated she was presently earning an income from her hair-styling business.

In the trial court's dissolution decree, it ordered the following with regard to child support payments:

In view of the Court's joint custody plan which includes extensive sharing of custodial duties, the Court will find circumstances require deviation from Form 14. The Court finds that [Wife] should pay

11. We note that the three other children Wife was referring to are children born from the pre-

vious two marriages of Wife's live-in paramour.

[Husband] a total of $200.00 per month as child support. ($100 per child).[12]

■ Rule 88.01 establishes a presumptive amount for child support as calculated pursuant to Form 14.[13] *Buckner,* 952 S.W.2d at 711. Deviation from the presumptive child support amount is permissible if the trial court makes "a written finding or a specific finding on the record that the amount so calculated, after consideration of all relevant factors, is unjust and inappropriate." *Id; Farr v. Cloninger,* 937 S.W.2d 760, 765 (Mo.App.1997). However, "[f]or meaningful appellate review, the trial court is required to determine and find for the record the presumed correct child support pursuant to Rule 88.01, utilizing Civil Procedure Form No. 14." *Neal v. Neal,* 941 S.W.2d 501, 504 (Mo. banc 1997)(citing *Woolridge v. Woolridge,* 915 S.W.2d 372, 379 (Mo.App.1996). "This is a mathematical calculation, the mandatory use of which ensures that the child support guidelines will be considered in every case as mandated in section 452.340.7, RSMo 1994 and Rule 88.01." *Id.* "The *Woolridge* opinion also thoroughly explains to the trial court how to make findings to rebut the presumed correct child support amount calculated pursuant to Form 14 when the trial court determines that the amount is unjust or inappropriate after consideration of all the relevant factors." *Id.*(citing *Woolridge,* 915 S.W.2d at 379, 382–83).

Here, the trial court is attempting to deviate from the Rule 88.01 schedule of child support. By its written finding the trial court decree does not satisfy the specific requirement that the trial court make " 'a written finding or a specific finding on the record that the amount so calculated, after consideration of all relevant factors, is unjust and inappropriate.' " *Buckner,* 952 S.W.2d at 711; *Farr,* 937 S.W.2d at 765. Additionally, our review of the record and the trial

court's decree shows that the trial court did not follow the procedures that are now required, as outlined in *Woolridge, supra.*

■ Wife's contention that a remand is necessary because the trial court did not determine the amount of presumed child support is meritorious. *Neal* requires this. Once the trial court has made that determination, the trial court may then decide if, considering all relevant factors, that amount is unjust or inappropriate. Point Two is granted.

### III.

■ In Wife's third assignment of error, she asserts that the trial court erred in its distribution of the marital estate. She contends that the marital personal property and non-marital personal property divisions stipulated by the parties were not adopted by trial court and that "the [real property] valuations adopted by the [trial] court were supplied by a non-owner, non-expert witness, the debts were not supported by evidence and the decree is not complete."

We review Wife's sub-point alleging that the "decree is not complete." It is dispositive of Wife's Point Three.

The decree contained the following paragraph relating to the division of the parties' marital assets:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the [Wife] is to receive the marital real estate located at 1035 W. Division, Springfield, Missouri and $10,000 for a total of $26,000, $15,000 of which is compensation for the marital one half, $5000 of [Husband's] Camaro automobile.... [14]

Wife's contends that the decree is not complete and is ambiguous due to the disposition of Husband's Camaro automobile and its pro-

---

**12.** We note that the trial court ordered Husband to maintain medical and hospitalization insurance coverage for both children. It also ordered Husband and Wife to pay one half of all medical, dental, optical, pharmaceutical and hospital expenses incurred on behalf of the children not covered by said insurance, including deductibles. "Case law declares that such a provision is an order for the payment of child support." *Short v. Short,* 947 S.W.2d 67, 69 (Mo.App.1997).

**13.** All rule references are to Missouri Court Rules (1997).

**14.** The dissolution decree awarded other, additional personal marital and non-marital properties to each of the parties.

vision regarding a $10,000.00 cash equalization payment and, therefore, should be remanded for new trial. Husband responds that the trial court's dissolution decree contains two typographical errors which cause the decree to be "mistakenly confusing."

 We agree that the foregoing paragraph of the judgment lacks lucidity. "Generally, for a decree or judgment to be enforceable, it must be definite and certain." *Sanders v. Sanders*, 933 S.W.2d 898, 902 (Mo.App.1996). "An obscure judgment, however, may be construed with reference to the pleadings and record, and where on the whole record its sense can be clearly ascertained, the judgment will be upheld." *Id.*

We determine, however, that the above-cited portion of the decree, relating to the division of marital property is ambiguous and indefinite. The trial court is ordered on remand to make definite its provision in the decree relating to the division of marital properties. Because of our determination herein, a review of Wife's remaining sub-points would be premature and are not taken up by this Court.

## IV.

In Wife's fourth and final assignment of error, she charges the trial court with error in denying her an award for her attorney's fees.

Section 452.355.1 provides that the trial court may award a party his or her attorney's fees after considering all relevant factors. *Halupa v. Halupa*, 943 S.W.2d 272, 278 (Mo.App.E.D.1997) The trial court is vested with broad discretion in awarding attorney's fees and the award will be reversed only upon a finding of an abuse of discretion. *Id.* A party's ability to pay his or her own attorney's fees is merely one of the relevant factors a court may consider under section 452.355.1. *Id.* Factors other than financial resources are to be considered, and how those factors balance will vary from case to case. *Id.* The trial court may also consider a spouse's conduct during the marriage in determining the payment of attorney's fees. Id.

The trial judge is considered an expert on the necessity, reasonableness, and value of an attorney's services. *Kiem v. Kiem*, 945 S.W.2d 603, 606 (Mo.App.1997). We conclude that there is nothing in the record to suggest that the trial court did not consider all the relevant factors in denying Wife an award for her attorney's fees. We find no abuse of discretion. *See id.* Point IV is denied.

Wife's motion to strike Husband's statement of facts in his appellate brief is denied.

The portion of the judgment and decree of dissolution ordering child support is set aside and the matter of child support is remanded to the trial court for further proceedings consistent with this opinion. That portion of the judgment and decree of dissolution purporting to make a division of certain marital properties between the parties, as outlined in the opinion herein, is set aside. The trial court is ordered to make a division of the parties' marital properties consistent with this opinion. Except as otherwise noted, the judgment and decree of dissolution is affirmed.

PARRISH, P.J., and SHRUM, J., concur.