**Sally BARTH, Appellant,**

v.

**David BARTH, Respondent.**

**No. WD 73727.**

Missouri Court of Appeals,
Western District.

April 10, 2012.

Gail Berkowitz–Gifford, Kansas City, MO, James D. Williamson, Jr., Independence, MO, for appellant.

James D. Boggs, Kansas City, MO, for respondent.

Before Division One: CYNTHIA L. MARTIN, Presiding Judge, KAREN KING MITCHELL, Judge and GARY D. WITT, Judge.

CYNTHIA L. MARTIN, Judge.

Sally Barth ("Wife") appeals from the trial court's judgment decree of dissolution of marriage. Wife contends that the trial court erred in (1) awarding her $2,500 per month in non-modifiable maintenance for one year; (2) accepting David Barth's ("Husband") valuations of the business interests owned by parties; (3) ordering the division of the parties' Victorian furniture because the language used in the judgment is ambiguous; (4) ordering her responsible for fifty percent of all college expenses for the parties' children; and (5) failing to award Wife attorney's fees. We affirm.

### Factual and Procedural History[1]

Husband and Wife were married on July 27, 1985. There are four children born of

1. We view the evidence in the light most favorable to the trial court's judgment and

the marriage: Janelle, born August, 1991; Jackson, born June, 1993; George, born September, 1995; and Blake, born January, 1998. On July 19, 2008, Husband and Wife separated. On November 5, 2008, Wife filed a petition for dissolution of marriage. Wife's dissolution proceeding was tried to the court on December 16–17, 2010.

During the marriage, Husband was a real estate developer. In furtherance of those efforts, Husband and Wife owned minority interests in numerous real estate development entities which owned land, primarily for the purpose of residential subdivision development (collectively, "the Entities").[2] Husband also worked as a realtor for REMAX.

Husband and Wife were the sole owners of an entity known as Northland Sports LLC/Parkville Athletic Complex LLC ("Northland Sports"). This entity operated a gym. Wife worked at Northland Sports during the marriage.

In the two years leading up to trial, the Entities generated substantial losses as the result of the declining real estate market. As a result, at the time of trial, neither party was capable of supporting themselves. Within the year preceding trial, Husband established a $1,000,000 line of credit secured by Northland Sports.[3] Husband used some of the proceeds of the line of credit to pay off the mortgage on the marital residence where Wife was living. Husband also used some of the proceeds of the line of credit to fund mortgage interest and real estate tax obligations of the Entities in an effort to prevent foreclosure of the real estate owned by the Entities. Husband also used the line of credit, as needed, to meet his personal financial needs.

To meet her financial needs, Wife occasionally took a salary from Northland Sports,[4] used student loans, obtained a loan against her vehicle, used insurance proceeds from an automobile accident that totaled her vehicle, used proceeds from the sale of land she owned with Husband's sister, and borrowed money from others.

In August 2010, Wife enrolled as a full-time student in a one-year accelerated nursing degree program. At trial, Wife testified about her employment prospects following completion of the program, and about the prospect for forgiveness of her tuition obligations depending on the employment she accepted.

On February 10, 2011, the trial court entered its judgment decree of dissolution ("Judgment"). Relevant to this appeal, the Judgment: awarded the parties joint legal and physical custody of the children and adopted the parenting plan submitted by Wife and stipulated to by Husband; ordered each party responsible for the expenses of the children while in that party's care; ordered each party responsible for fifty percent of the children's college expenses; directed the parties to divide Victorian furniture; ordered Husband to pay

---

defer to the trial court's credibility determinations. *Potts v. Potts*, 303 S.W.3d 177, 184 (Mo.App. W.D.2010).

**2.** The record suggests some of the interests in the Entities were owned solely by Husband, some may have been owned by Husband and Wife, and one was owned solely by Wife. The parties do not contest that the interests owned in the Entities, however titled, were marital property. We will refer to the interests in the Entities, therefore, as the joint property of Husband and Wife.

**3.** At trial, Wife complained that she was not contemporaneously aware that Husband had established the line of credit.

**4.** By the time of trial, Wife was no longer working at Northland Sports in part because she had become a full-time student.

Wife maintenance in the amount of $2,500 per month for one year through January 2012; awarded Wife the marital home valued at $495,000 which was free and clear of debt; awarded Husband the interests in the Entities and Northland Sports; ordered Husband to exercise his best efforts to secure Wife's release from the debts of the Entities and Northland Sports which the parties had personally guaranteed, and in any event to indemnify Wife for those debts; and ordered each party to pay his or her own attorney's fees.

Following the entry of Judgment, Wife filed a motion for recusal of judge and for new trial which was denied. Wife appeals.

### Standard of Review

 We will affirm the decree of dissolution unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Green v. Green,* 341 S.W.3d 893, 894 (Mo.App. W.D.2011) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). "We view the evidence in the light most favorable to the decree, disregard evidence to the contrary, and defer to the trial court even if the evidence could support a different conclusion." *Sweet v. Sweet,* 154 S.W.3d 499, 503–04 (Mo.App. W.D.2005). We defer to the trial court's credibility determinations and "assume all factual issues were resolved in favor of the judgment entered." *Id.* at 504. "We review questions of law de novo." *Green,* 341 S.W.3d at 894 (citing *Smith v. Am. Family Mut. Ins. Co.,* 289 S.W.3d 675, 680–81 (Mo.App. W.D.2009)).

 We review the trial court's division of property, setting of child support awards, grant of maintenance, and award of attorney's fees for an abuse of discretion. *Sabatino v. Sabatino,* 314 S.W.3d

854, 858 (Mo.App. W.D.2010); *Tracy v. Tracy,* 961 S.W.2d 855, 863 (Mo.App. S.D. 1998). An abuse of discretion is only found where the award is " 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, it cannot be said the trial court abused its discretion.' " *Sweet,* 154 S.W.3d at 504 (citation omitted).

### Analysis

*Point I*

For her first point, Wife claims that the trial court erred in determining the amount and duration of maintenance by awarding her non-modifiable maintenance of $2,500 per month for one year, through January 2012. Specifically, Wife claims that the trial court (i) reduced Wife's reasonable needs without sufficient evidence; (ii) failed to consider the parties' standard of living during the marriage; (iii) improperly limited the duration of maintenance based on speculation that she would complete nursing school, secure employment, and become self-supporting; (iv) improperly considered Husband's investment losses in determining his ability to pay; and (v) improperly designated the award of maintenance as non-modifiable.

It is not contested that Wife established the threshold statutory requirements set out in section 452.335.1 [5] to demonstrate that she was entitled to maintenance. In fact at trial, Husband testified that he had no objection to paying Wife maintenance, though he believed it should be limited in duration to the time Wife completed her nursing program in August 2011. Our focus, therefore, is not on the award of

---

**5.** All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

maintenance, but rather on the amount and duration of maintenance awarded.

■ Section 452.335.2 describes the factors that are to be considered in determining both the amount of maintenance, and the period of time over which it should be awarded. Those factors are:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

Section 452.335.2. " 'A trial court has broad discretion in setting the amount and duration of a maintenance award[.]' " *Green*, 341 S.W.3d at 894 (quoting *Sweet*, 154 S.W.3d at 504). Following our review of the record, we conclude that the trial court did not abuse its discretion in awarding non-modifiable maintenance of $2,500 per month for the limited duration of one year. In explanation, we address each of the varied claims of error raised by Wife.

**(a) Reduction of Wife's reasonable needs/consideration of standard of living**

■ Wife asserts that the amount of maintenance awarded was too low because the trial court reduced her reasonable needs without sufficient evidence. Wife also asserts that the trial court failed to take into consideration the parties' standard of living while married. We disagree.

■ " '[R]easonable needs' is the standard for determining the expenses properly allowable to a party seeking maintenance; and the court must determine whether the expenses in question constitute 'reasonable needs' of the requesting party." *Nichols v. Nichols*, 14 S.W.3d 630, 636 (Mo.App. E.D.2000). Wife's income and expense statement claimed monthly expenses of $9,288. The trial court found that $2,500 per month included in this sum for tuition should be disregarded. The tuition was not actually being paid, but was instead a deferred and conditional obligation. Wife testified that her tuition obligation would be forgiven if she accepts employment for two years with an HCA hospital following her graduation. Conversely, if Wife does not complete the program, or satisfy the employment criteria with HCA, she will become obligated to pay her tuition at that time. Wife testified she expected to graduate from her nursing program, and that she would probably work at an HCA mental facility for two years following her graduation. Wife thus anticipates the ability to secure forgiveness of her tuition obligation. Section 452.335.2 directs the trial court in setting the amount of maintenance to consider the financial resources of the party seeking

maintenance, *including the ability to meet that party's needs independently.* As a result, it was not an abuse of discretion for the trial court to exclude consideration of Wife's future, contingent obligation to pay tuition from its determination of Wife's "reasonable needs."

In addition to disregarding tuition, the trial court also expressed the conclusion that Wife's income and expense statement did not otherwise accurately reflect her reasonable needs. The trial court observed in its Judgment "that the expenses listed in [Wife's] Income and Expense Statement were stated by her as 'what would be nice to be able to spend' as opposed to what actually constituted her necessary expenses." The trial court found that many of Wife's expenses were "bloated, such as her request for a $500 a month vacation expense." Wife argues that the trial court improperly failed to consider the parties' standard of living during the marriage in determining that Wife's expenses did not reflect her "reasonable needs."

In determining maintenance, "reasonable needs" does not automatically equate to the standard of living established during the marriage; the standard of living is merely one factor to be considered. *Nichols,* 14 S.W.3d at 636. Moreover, while the parties here did enjoy a high standard of living during most of their marriage, the record was clear that because of the down turn in the economy and its impact on the real estate market, the parties would not have continued to enjoy the same high standard of living had they remained married.

It appears that the true essence of Wife's complaint is that the amount she was awarded for maintenance is far less than the "reasonable needs" reflected on her income and expense statement, even assuming reduction of her expenses by the amount of her tuition. The fallacy of this contention is the inherent, but erroneous, assumption that the trial court accepted Wife's income and expense statement as representative of her "reasonable needs." It did not. Even had the trial court accepted Wife's posited expenses as indicative of her "reasonable needs," Wife cites no authority for the proposition that the trial court was required to award maintenance in the amount of the difference between her "reasonable needs" and her income. In fact, the reverse is true. *See Squires v. Squires,* 734 S.W.2d 613, 614 (Mo.App. W.D.1987) ("The trial court is vested with substantial discretion in awarding maintenance, but is not required to meet all of the needs of the spouse receiving the award.")

As the trial court found that neither party was able to support themselves, we cannot conclude that the trial court abused its discretion in discrediting Wife's expenses to the extent they presumed a lifestyle the parties could no longer afford. The trial court did not abuse its discretion in awarding Wife $2,500 per month in maintenance.

**(b) Limited duration of maintenance award**

Wife next asserts that the trial court erred in limiting the duration of maintenance to one year because the trial court necessarily speculated that she would complete nursing school, secure employment, and become self-supporting. We disagree.

Section 452.335.2 expressly authorizes a trial court to order maintenance "for such periods of time as the court deems just." In so doing, one of the factors the trial court is directed to consider is "the time necessary to acquire sufficient education or training to enable the

party seeking maintenance to find appropriate employment." By its nature, this factor requires a trial court to "speculate" about future events. "Although generally, '[m]aintenance should not be conditioned upon happenings in the future,' an exception exists when 'evidence shows the circumstances of the parties would likely change in the future.'" *Green*, 341 S.W.3d at 896 (citations omitted). Thus, "[c]ourts can award rehabilitative [or limited] maintenance where a party needs further training or education to become self-supporting." *Isakson v. Isakson*, 277 S.W.3d 784, 787 n. 2 (Mo.App. S.D.2009).

> Moreover, rehabilitative or limited maintenance is awarded where substantial evidence demonstrates an impending change in the recipient's financial position, or a reasonable likelihood such change will occur. This may occur, for instance, where one spouse is pursuing additional training or education which will markedly change that person's earning capacity, and a known time frame exists for completion of that training or education. ***Rehabilitative maintenance routinely is limited to a time period***—our research has found no case otherwise—***since implicit in such an award is that the recipient will be self-supporting at the end of the time period.***

*Id.* at 787 (emphasis added) (internal citations and quotation marks omitted); *See also In re Marriage of Harris*, 908 S.W.2d 854, 859 (Mo.App. S.D.1995) (quoting *Hernandez v. Hernandez*, 872 S.W.2d 161, 163 (Mo.App. W.D.1994) ("'Implicit in a limited maintenance award is the conclusion the recipient spouse will be self-supporting at the end of the time period.'")); *In re Marriage of Runez*, 666 S.W.2d 430, 433 (Mo.App. S.D.1983) ("In determining the wife's ability to support herself, the trial court can consider probable future prospects, but the evidence must justify the inference that the wife will realize such expectations.").

Similar to the facts in the present case, in *Allen v. Allen*, 927 S.W.2d 881 (Mo.App. W.D.1996), an award of limited maintenance for a period of three years was upheld where wife was unemployed at the time of trial but testified that she was planning on opening her own floral business which she believed would be profitable in three to five years. *Id.* at 887. In finding no abuse of discretion, this court held that the award of limited maintenance "reflects the trial court's acceptance that [wife] will become self-supporting in three years." *Id.* This court found that it was not mere speculation as the evidence included a projection of three years for the business to make a profit and a "revenue prospectus prepared by the lending bank" which provided a reasonable basis for the trial to find that wife's business plan was "not a pie in the sky." *Id.*

In contrast, in *Isakson*, the Southern District found that while the trial court had the authority to award limited maintenance, the trial court's judgment requiring husband to pay 100% of wife's fees, tuition, and books to attain a bachelor's and master's degree was too vague and indefinite to be upheld. 277 S.W.3d at 787. There, the Southern District identified the evidence that was lacking, including: (1) any schedule or timeframe within which wife even suggested that she would pursue her education; (2) any evidence of when wife could earn an income with her degrees; (3) any evidence of what income wife might earn; and (4) any evidence that wife would start or finish her education within any specified time period, or that she felt obliged to do so. *Id.* The court noted that wife testified that she needed six years of full time study for both degrees, but that she may go to school part-time initially as the children were her first priority. *Id.*

Here, Wife testified regarding all of the evidence that was missing in *Isakson.* Wife testified that: (1) she was currently enrolled in a *one-year* accelerated BSN program at Research Hospital from which she would graduate in August 2011; (2) she would likely be able to obtain employment upon graduation; (3) she planned to work at an HCA hospital for two years because that would result in forgiveness of tuition for which she would otherwise be billed; (4) she was motivated to pass her courses and to complete the program to avoid being billed for tuition for the courses she had taken; (5) it was a "reasonably safe assumption" that she would be immediately employed following her graduation because "they wouldn't be giving the forgiveness program if they didn't feel like the availabilities were there;" (6) upon employment, she would begin producing income, and that once she passed her boards, her income would increase; and (7) her starting salary would be approximately $20 per hour or just slightly under $800 per week.

Wife's argument that it was improper for the trial court to speculate that she would graduate from the nursing program is without merit given her own testimony. The trial court made a present award of maintenance based upon substantial evidence of impending financial change. The trial court did not abuse its discretion in limiting the duration of its award of maintenance. *See Green,* 341 S.W.3d at 896.

### (c) Consideration of Husband's investment losses

 Next, Wife argues that the trial court erred in considering the investment losses of the Entities in determining Husband's ability to pay maintenance because the investment losses had already been taken into account in the trial court's division of the property and debts. We disagree.

Wife acknowledges that section 452.335.2 requires a trial court to consider "the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance." The trial court found that "[Husband] is currently unable to support himself." In fact, the trial court found that Husband was funding the Entities from the proceeds of a line of credit secured by Northland Sports, and that Husband would be required to take out a second line of credit secured by property awarded him in the divorce to fund a maintenance award to Wife.

In her brief, Wife argues that Husband's income and expense statement reflects that he receives $133,799 per year as a realtor with REMAX, and that the trial court improperly set off this amount by $321,149 in annual investment losses from the Entities. According to Wife, this was error because the investment losses had already been taken into account in the division of property and debts. Wife further contends that the investment losses shown on Husband's income and expense statement are not out of pocket expenses that will have to be paid from Husband's REMAX income.

Wife offers no authority for the argument that consideration of investment losses before valuing and dividing marital property prohibits a trial court from considering those same losses as a reasonable expense in calculating an ability to pay maintenance. *Smith v. Smith,* 985 S.W.2d 829, 834 (Mo.App. W.D.1998) (Rule 84.04(d) requires appellants provide appropriate citation to authority in support of their contentions. Where no authority exists on an issue, an explanation for the absence of authority is required and if no explanation is given, we may consider the

point to be abandoned). We perceive no inherent conflict which prevents an expense from being considered both to value marital property in connection with its equitable division, and to determine the resources available to a party to pay an award of maintenance.

■ In any event, Wife did not question the inclusion of investment losses in Husband's income and expense statement at trial. Wife did not cross-examine Husband about the inclusion of the investment losses on his income and expense statement. Wife never advised the trial court that she believed the investment losses were not an actual out of pocket expense, or that the losses had already been accounted for in the valuation of the marital property in a manner disqualifying their consideration in connection with Husband's ability to pay maintenance. We will not indict the trial court for claimed error it was *never given the opportunity to consider*. *Arnold v. Minger*, 334 S.W.3d 650, 654 (Mo.App. S.D.2011) ("We decline to convict the trial court of error on something which it was not accorded an opportunity to rule and which is presented for the first time on appeal."). Moreover, Wife "cites us to nothing in the record to cast doubt upon the validity of the expenses" identified on Husband's income and expense statement. *Handy v. Handy*, 338 S.W.3d 852, 859 (Mo.App. W.D.2011). "Given the unchallenged evidence in the record, the trial court's findings" with respect to Husband's inability to support himself as evidenced by his income and expense statement "are supported by substantial evidence." *Id.*

■ Wife has not directed us to any authority suggesting that the trial court was bound to consider other resources available to Husband in determining his ability to pay beyond Husband's unchallenged income and expense statement. Though Husband was awarded the Entities, it was uncontested that the Entities were not generating any income at the time of trial, and that Husband had taken out a $1,000,000 line of credit secured by Northland Sports to pay obligations owed by the Entities during the economic down turn. We have long observed that a party seeking maintenance generally need not deplete or consume marital assets awarded to the party to establish a right to receive maintenance.[6] *Hall v. Hall*, 336 S.W.3d 188, 200 (Mo.App. W.D.2011). Similarly, in determining the ability to pay, a party obligated to pay maintenance may not be required, except in extraordinary circumstances, to deplete or consume marital assets awarded to the party. *Handy*, 338 S.W.3d at 857–58.

■ On this record, in light of the trial court's clear and supportable findings that neither party could afford to support his or herself, the trial court could have found that no maintenance should be awarded to Wife. "An award of maintenance should not exceed the husband's capacity to provide." *Squires*, 734 S.W.2d at 614. As it is, Husband *volunteered* to pay limited duration maintenance. Husband testified (as the trial court noted in its Judgment) that to do so, he would be required to borrow funds. But for Husband's consent and invitation for the trial court to do so, we believe it would have been error for the trial court to order or presume the bor-

---

6. This general principle must be distinguished from a trial court's obligation to specifically consider the income which will be generated from income producing property awarded to a party requesting maintenance in determining whether, and in what amount, mainte-

nance should be awarded. *See, e.g., Conrad–Neustadter v. Neustadter*, 340 S.W.3d 660, 665 (Mo.App.W.D.2011) ("Investment income is to be considered in determining whether the spouse has sufficient income to provide for his or her reasonable needs.")

rowing of funds in determining Husband's ability to pay maintenance, as such a scenario is indistinguishable from ordering or presuming the liquidation of marital property in determining a spouse's ability to pay maintenance. *Handy,* 338 S.W.3d at 857–58.

We cannot conclude that the trial court's award of maintenance constituted an abuse of discretion in the manner in which it considered Husband's ability to pay. *Sabatino,* 314 S.W.3d at 858.

**(d) Designation of the maintenance award as non-modifiable**

■■■ Finally, Wife argues that the trial court erred in designating the maintenance award as non-modifiable. We disagree.

■■■ Section 452.335.3 requires a trial court to designate whether a maintenance award is modifiable or non-modifiable. The trial court thus had the authority to exercise its discretion in making this designation. *Burnett v. Burnett,* 18 S.W.3d 27, 32–3 (Mo.App. W.D.2000). However, "[j]ust as an award of limited duration must be supported by substantial evidence of an impending change of the party's circumstances, a maintenance order providing that it is 'non-modifiable' must be justified by the facts and circumstances of the particular case." *Allen,* 927 S.W.2d at 890; *Burnett,* 18 S.W.3d at 33. "'[M]aintenance issues for support and only for support—and then, until the dependent spouse achieves a reasonable self sufficiency.'" *In re Marriage of Michel,* 142 S.W.3d 912, 925 (Mo.App. S.D.2004) (citation omitted). "'Where future events which may be pertinent to the issue of maintenance are uncertain, such an award should be modifiable.'" *Allen,* 927 S.W.2d at 890 (citation omitted). It follows that where the evidence suggests that future events pertinent to the issue of maintenance are not uncertain, designation of the award of maintenance as non-modifiable is not an abuse of discretion.

Wife has failed to demonstrate how future events pertinent to the issue of maintenance are uncertain. The same evidence which supported the trial court's decision to award Wife maintenance for a limited duration until she could support herself with her nursing degree serves as well to suggest that Wife's future ability to support herself is not uncertain. The trial court did not abuse its discretion in designating the maintenance award as non-modifiable.

Point one is denied.

*Point II*

For her second point, Wife argues that the trial court erred in accepting Husband's values of the interests Husband and Wife held in the Entities and/or in Northland Sports. Wife claims the trial court erred because it: (1) discounted the value of the interests held in the Entities by carrying costs which had already been taken into consideration in valuing the real estate owned by the Entities; (2) discounted the value of the interest held in Northland Sports by amounts that would be incurred upon a sale of the interest though no evidence supported the conclusion that a sale of the interest would occur; and (3) excessively discounted the value of the interests held in the Entities because the interests represented minority ownership positions. We disagree.

**(a) Discount of value of interests held in Entities by carrying costs**

■■■ First, Wife argues that the trial court erred in discounting the value of the parties' ownership interests in the Entities by carrying costs because carrying costs had already been taken into consideration in valuing the real estate owned by the Entities. We disagree.

The complete extent of Wife's argument on this point is contained within a single paragraph of her brief as follows:

> In the present case, the parties had already stipulated to the appraised values of the business interests performed by Thomas Pryor and Bliss & Associates. Those appraisals already accounted for the time necessary to market the properties and the carrying costs involved. In applying a 30 month carrying cost discount on top of the appraisals, the trial court clearly erred in accounting for carrying costs twice.

We first observe that the appraisals Wife refers to that were performed by Thomas Pryor and Bliss & Associates were **not**, as Wife suggests, appraisals of the "business interests" owned by Husband and Wife in the Entities. Rather, they were appraisals of the real estate owned by the Entities *at the entity level.* The real estate appraisals were stipulated to by the parties. There is a difference, however, between valuing the real estate owned by the Entities at the entity level, and valuing the personal property interest owned by Husband and Wife in each of the Entities. Having said that, the appraised value of an entity's assets generally serves as the rough starting point for placing a value on an investor's ownership interest. Thus, Wife correctly observes that specific discounts taken in the value of the assets held by the Entities at the entity level should not be taken again in assigning a value to the ownership interests owned by the parties in the Entities.

The record, however, does not support Wife's assertion that both the appraised value of the real estate owned by the Entities, and the value of the parties' ownership interests in the Entities, were discounted by a 30 month carrying cost. Susan Cooper, a CPA, ("Cooper") testified for Husband as an expert witness for the purpose of establishing a value for the ownership interests held by Husband and Wife in each of the Entities and in Northland Sports. She prepared a chart which summarized her opinions, and which was received into evidence *without objection* as a part of Husband's Exhibit A. That chart noted the stipulated appraised value of the real estate held by each of the Entities, and the stipulated debt owed against the real estate. Using the difference as her starting point,[7] Cooper then "adjusted" the value of the parties' ownership interests in the Entities by various factors, including a 30 month carrying cost.[8] In her testimony, Cooper defined "carrying costs" as the real estate taxes and interest payments owed by the Entities which must be covered (or paid) by the investors out of their own pockets over a period of time because the Entities are unable to pay those expenses through the ordinary course sale of residential lots.[9] The trial court's Judg-

---

7. Wife does not object to, and in fact embraces, the assumption that the appraised value of the real estate at the entity level less the debt owed against the real estate should serve as the starting point for the determining the value of the ownership interest held by an investor in the entity.

8. Cooper's chart also reflects a discount from the appraised value of the real estate held at the Entity level for the fact the ownership interest in each Entity held by Husband and Wife was a minority interest, an issue we discuss, *infra.*

9. We are not suggesting that investors in a closely held entity like the Entities have personal liability for real estate taxes or interest owed by the entity in the absence of personal guaranties. However, the practical reality is that such investors are often motivated to "fund" an entity's obligations until the entity can sustain itself, in order to avoid foreclosure of the entity's real estate and the subsequent loss of any prospect of securing a return on their investment.

ment incorporated Cooper's chart, and thus adopted as its own findings Cooper's opinions about the carrying costs, and their impact on the value of the parties' ownership interests in the Entities.

Wife called Thomas Pryor ("Pryor"), one of the real estate appraisers, as a witness. Pryor testified that in connection with the appraisals he prepared,[10] he took into consideration "a reasonable time for exposure on the open market." Specifically, the appraisals Pryor prepared indicated he believed this time frame to be 6 to 12 months. When asked to explain, Pryor testified that he prepared his appraisals presuming a bulk sale of the residential lots owned by the Entities, versus an ordinary course sale of individual lots over time. As such, he believed it appropriate to discount the value of the real estate owned by the Entities that he appraised to take into consideration the time it might take to sell several lots in bulk. Specifically, Pryor testified as to one of the Entities, by way of example:

> So we're really looking for a price that one person, another investor, developer, builder, what have you, would want

these fifteen lots all at one time and what would they pay for them. The concept being that over time it takes—it takes time and money and risk to sell lots over a period of time. So we try to discount those back to a value that's all in—So we try to discount the retail value lots [sic] back to a price where one entity would come in and purchase all those lots at one time.

The bulk sale, or "marketability," discount of the value of the real estate owned by the Entities is obviously distinguishable from the discount of the value of the ownership interests in the Entities required to account for an owner's personal funding "carrying costs." Discounting the value of real estate to account for its marketability if sold in bulk is qualitatively different from discounting the value of an ownership interest in an entity by the real estate taxes and interest the owners will pay out of their own pockets to "carry" the entity until it can sustain itself by selling individual lots in the ordinary course.

In the Statement of Facts in Wife's brief,[11] Wife claims that Cooper admitted

---

**10.** Pryor did not prepare all of the stipulated real estate appraisals. Some were prepared by Bliss & Associates.

**11.** Wife's extremely limited discussion in the argument portion of her brief did not assist this court as it attempted to make heads or tails out of Wife's loose, conceptual argument that carrying costs were erroneously double counted. We were thus required to engage in an extensive independent review of the record to sort through Cooper's and Pryor's testimony, the relevant aspects of the trial court's judgment, and voluminous trial exhibits addressing the valuation of the real estate and business interests in order to gather the information necessary to meaningful discuss the complaint raised by Wife. That is a refrain which was, unfortunately, repeated throughout Wife's brief. Rule 84.04(i) requires "[a]ll statements of fact **and argument** *shall* have *specific page references* to the legal file or

transcript." (Emphasis added.) " 'This requirement is mandatory and essential for the effective functioning of appellate courts, which cannot spend time searching the record to determine if factual assertions are supported by the record.' " *Bishop v. Metro Restoration Services, Inc.*, 209 S.W.3d 43, 46 (Mo. App. S.D.2006) (quoting *Miller v. Help at Home, Inc.*, 186 S.W.3d 801, 807 (Mo.App. W.D.2006)); *see also Boyd v. Boyd*, 134 S.W.3d 820, 824 (Mo.App. W.D.2004) ("It is not the function of the appellate court to search the record to discover the facts that substantiate a point on appeal."). Though Wife's brief falls short of the requirements of Rule 84.04(i), we have nonetheless endeavored to search the record to place the meat on the skeletal bones of many of the issues raised by Wife on appeal.

that the real estate appraisal prepared by Bliss & Associates ("Bliss") for Quality Land Holdings, LLC, one of the Entities, "took into consideration real estate taxes, exposure time, marketing time and a bulk rate discount of 50%." Wife also claims in her Statement of Facts that Cooper testified that all of the appraisals took carrying costs into consideration. From this testimony, Wife argues that we should conclude that the trial court erroneously double counted carrying costs in valuing the parties' ownership interests in the Entities. We disagree. Wife has mischaracterized Cooper's testimony, and the references in the appraisals on which she relies.

In connection with the Bliss appraisal for Quality Land Holdings, LLC, Cooper offered the following testimony on cross-examination:

Q: Section, Quality Land [referring to Husband's Exhibit A]. And there is contained within that section an appraisal by Bliss on the 45 developed single-family lots, as well as acreage?

A: Yes.

Q: Okay.... Page 23, specifically, real estate taxes. Real estate taxes for the subject lots are calculated in the income section of the report. They took that into consideration, didn't they?

A. Part of—

Q: Did they take it into consideration pursuant to this paragraph?

A: That is what this paragraph states.

From this rather confusing line of testimony, Wife surmises that Cooper admitted real estate taxes were double counted. We disagree. Cooper did not in any way explain or discuss how real estate taxes were "considered" in the Bliss appraisal. Nothing in Cooper's testimony suggests that real estate taxes were "considered" by Bliss in the same sense that they were considered by Cooper in discounting the value of the parties' ownership interest in

Quality Land Holdings, LLC by the amount Husband would pay out of his own pocket for 30 months to "carry" the entity until it could sustain itself.

Though Wife failed to do so at trial or in her brief, we have independently examined the "income" section of the subject Bliss appraisal. In a chart on page 39 of that appraisal, titled "Discounted Cash Flow Analysis," Bliss projected the net income that could be expected in Quality Land Holdings, LLC for five years. It projected lot sales, then deducted ordinary expenses that would need to be paid from those sales proceeds (which included real estate taxes) to arrive at a net income figure for each of the five years. *Bliss then discounted this number by 18%.* The 18% discount is explained in the preceding pages of the appraisal as a discount rate—defined by Bliss as "a measurement of the desired rate of return for a particular investment, generally based on the risk associated with that investment." A discount rate is essentially the amount the seller of a valuable commodity is willing to discount the "face value" of the property in exchange for cash. In other words, in this context a discount rate is, much as Pryor testified, a discount for a bulk sale. Bliss's calculation of the present day fair market value of the real estate which could be expected to earn net income over five years at a certain level by a discount rate of 18% is a discount on a rate of return for a present day sale. This is *not* the same as the discount taken by Cooper for the amounts Husband would have to pay out of pocket to cover Quality Land Holdings, LLC's real estate tax and interest obligations for 30 months to "carry" the entity until it could sustain itself by the sale of individual lots in the ordinary course.

In connection with Wife's claim that Cooper admitted that all of the appraisals

took carrying costs into consideration, Cooper actually testified as follows:

Q: [By Husband's counsel] Okay. Now I want to go to another topic. I want to talk about the concept of marketability versus the concept of carrying costs. All right?

A: Okay. Uh-huh. Uh-huh.

. . . .

Q: Is the concept of a marketability discount a concept that if the shelf life is twelve months, that if the cost of money is five percent, that one would be wise to sell a $1,000,000 asset for $950,000 to get your money today rather than wait a year to get your million?

A: For the whole—For the asset as a whole, that's correct.

Q: Okay. However, while how much—take that same business entity. If we further assume that business entity has taxes that are due, has significant mortgage debt to pay, while those factors may not influence fair market value or marketability, it's a financial reality any seller must take into accounting determining how much money they are going to make off the deal?

A: Absolutely. Absolutely.

Q: Hence, it's not inappropriate to take both a marketability discount and also look at carrying costs.

A: The way that I would explain it is, you have an asset that the appraisers have given you a value of that asset as a total on a given day. That being on this particular day, you still have the ongoing—even if you know that on today's value it is this, you still have to hold that asset so that you can find that willing seller, whether it's in a bulk sale, which takes the factors that they did in the appraisal, or each lot singly. You have to have some time to do that or you won't be able to continue to carry the asset.

On cross-examination, Wife secured Cooper's acknowledgement that if the sales price of property is discounted, the property will sell faster, thus reducing the time frame one will be obligated to pay carrying costs. This is obvious. The "concession," however, actually reinforces the difference between the "marketability" discounts taken by the appraisers in valuing the Entities' real estate, and the carrying cost discounts taken by Cooper in valuing the parties' ownership interests. The first is a measure of how much a property's price might have to be reduced to accomplish a faster sale. The latter is a measure of how much will have to be paid to carry the property will awaiting a sale. The appraisals reflected "marketability" discounts which calculated the amount the Entities could expect to receive for the real estate if offered for sale, *in bulk,* on the day of the appraisals. Though the appraisals presumed a 6–12 month marketing exposure time frame in calculating the "fair market value" for a bulk sale, the appraisals did not reduce the fair market value by the carrying costs the Entities would incur during the anticipated marketing time period. In contrast, the carrying cost discounts taken by Cooper presume the Entities' real estate will *not* be sold in bulk, but instead that the owners will "carry" the Entities for the 30 months Cooper opined it would take for the market to improve so the Entities could sustain themselves through the ordinary course sale of individual lots.

Thus, the difference between the 6–12 month marketing exposure time frame presumed necessary by the appraisers for a bulk sale of the real estate, and the 30 months Cooper assumed the owners of the Entities would have to pay carrying costs before the Entities could sustain themselves is explained by the fact Cooper presumed there would not be a bulk sale of

the Entities' real estate. Her assumption is supported by the record. Husband testified that the owners of the Entities did not want to sell the Entities' real estate in bulk, but instead wanted to fund carrying costs until the market turned around and the Entities could sustain themselves through the sale of residential lots in the ordinary course. Wife offered no evidence to suggest that the Entities would become self sustaining in less than 30 months, or that, notwithstanding Husband's testimony, the Entities would elect to sell the real estate in bulk in less than 30 months, thus cutting off Husband's need to fund carrying costs. The trial court was free to believe Husband's testimony that the owners of the Entities did not desire to sell off their real estate in bulk because they believed the market would turn and that the Entities would eventually sustain themselves. The trial court was also free to believe Cooper's testimony that it would take 30 months for this turn around to occur. "We view the evidence in the light most favorable to the decree ... and defer to the trial court even if the evidence could support a different conclusion." *Sweet*, 154 S.W.3d at 503–04.

We conclude that Wife's claim that the trial court erroneously double-counted a discount for 30 months of carrying costs is not supported by the record.

**(b) Discount of value of interest held in Northland Sports**

▮ Next, Wife claims that the trial court erred in deducting from the value of the ownership interest in Northland Sports closing costs in the amount of $200,000 and embedded income tax costs in the amount of $106,274 which would be incurred should that business be sold because there was no evidence that Husband was going to sell Northland Sports. We disagree.

The trial court found that although Husband does not desire to sell Northland Sports, Husband "admits that a sale of this property may be necessary in order to come up with the liquid funds necessary to fund the remaining business entities of the parties in order to economically survive." The trial court's finding is supported by the weight of the evidence.

At trial, Husband testified that he preferred not to sell Northland Sports in part because it operated for youth sports and he coached a youth wrestling team that utilized the facility. However, Husband also testified that Northland Sports had always lost money. Husband testified that in August 2010, he obtained a $1,000,000 line of credit through Platte Valley Bank secured by Northland Sports when the market took a down turn so that he could pay expenses owed by the Entities to avoid the foreclosure of the real estate owned by the Entities. Husband testified that at the time he initiated the line of credit, he had maxed out lines of credit available on other properties owned by the Entities, and/or had learned lines of credit could no longer be secured on other properties, leaving no option but to borrow against the assets of Northland Sports. The first $323,000 drawn on the $1,000,000 line of credit was used to pay off the mortgage owed on the marital residence-an asset valued at $495,000, and awarded to Wife free and clear of debt. In addition, Husband testified at trial that at least $30,000 was being drawn on the line of credit each month to fund his share of the carrying costs for the Entities. The line of credit was also being used to pay some of Husband's personal expenses. Cooper testified at trial that the value of Husband's and Wife's 100% ownership interest in Northland Sports was only $1,109,087. Husband testified that notwithstanding his desire to hold on

to Northland Sports, sale of the property might very well become necessary.

■ Wife argues that because a sale of Northland Sports was not assured or imminent, the trial court erred in discounting the value of the ownership interest in the business by closing costs and the income tax effect of sale. " 'Tax consequences are a factor to consider in dividing marital assets.' " *Elrod v. Elrod,* 192 S.W.3d 738, 743 (Mo.App. S.D.2006) (quoting *Homfeld v. Homfeld,* 954 S.W.2d 617, 621 (Mo.App. W.D.1997)). "However, the trial court is not permitted 'to make deductions to the marital estate for estimated tax liabilities absent sufficient evidence to support its findings.' " We cannot conclude on this record that the trial court erroneously considered the costs and tax effects of a likely sale of Northland Sports in valuing the parties' ownership interest in that business.

### (c) Minority discount of value of business interests

■ Finally, Wife argues that the trial court erred in applying a 45% minority discount to the value of the ownership interests held by Husband and Wife in the Entities. We disagree.

Cooper testified that an additional adjustment to the value of the interests owned by Husband and Wife in the Entities was required because the ownership interests were minority interests.[12] Cooper testified that a minority discount takes into consideration that minority owners cannot make controlling decisions about an entity, and thus bear less influence in the operation of the entity. Cooper also testified that as a result, a minority ownership interest is less marketable, thus affecting

its value. After discussion about her basis for doing so, Cooper opined that the appropriate minority discount to be applied to the parties' ownership interests in the Entities was 45%. Wife did not object to the admission of Respondent's Exhibit G which included Cooper's discussion of the minority discount and of Cooper's subsequent opinion about the collective value of the parties' interests in the Entities and in Northland after considering all deductions and discounts.

■ Wife does not argue that a minority discount of the interests held by the parties in the Entities was inappropriate. In fact, Wife's expert (attorney William Shapiro) testified at trial that a minority discount of the parties' interests in the Entities was necessary. Wife argues only that a 45% discount was excessive. Though Wife did cross-examine Cooper in an effort to discredit her opinion about the proper minority discount, Wife offered no contrary evidence on the subject of the proper amount of the minority discount. "The trial court is entitled to believe or disbelieve the testimony of the parties or their experts regarding valuation, and this Court defers to the trial court's determination of the credibility of witnesses." *Short v. Short,* 356 S.W.3d 235, 246 (Mo.App. E.D.2011). "In an action for dissolution, it is the duty of the trial court to decide the weight and value to be given the testimony of witnesses." *McKee v. McKee,* 940 S.W.2d 946, 950 (Mo.App. S.D.1997). Here, the trial court clearly accepted Cooper's testimony about the amount of the minority discount, as Cooper's valuation calculations (which include the 45% minority discount) were adopted and incorporated by the trial court in its judgment. The trial court's finding that 45% was the prop-

---

12. Because Husband and Wife owned 100% of Northland Sports, Cooper did not suggest a minority discount for this business interest, and the trial court did not apply a minority discount to this interest.

er minority discount to be applied to the value of the parties' ownership interests in the Entities is not against the weight of the evidence.

### (d) Conclusion to Wife's claims of error

■ In the concluding remarks of Wife's brief following her discussion of the aforesaid specific claims of error, Wife complains that the trial court's discounted values of the parties' ownership interests in the Entities and/or in Northland Sports were facially erroneous, as they reflect a 91% reduction from the initial equity value of the interests (the appraised real estate values less the debt owed against the real estate). Wife also generally complains that it was unfair to award Husband all of the interests owned by the parties in the Entities and in Northland Sports at such an excessively discounted value while she remains personally liable on many of the debts owed by the Entities and/or Northland Sports.

Neither argument was raised in Wife's point relied on, and thus neither argument is preserved for our review. Rule 84.04(e); *Burg v. Dampier*, 346 S.W.3d 343, 354 (Mo.App. W.D.2011). Even had Wife preserved these arguments for our review, we would find them to be without merit.

■ "'As to the court's division of marital property, we will reverse the trial court's decision only when the division so unfairly favors one party that it amounts to an abuse of discretion.'" *Kelly v. Kelly*, 340 S.W.3d 673, 676 (Mo.App. W.D.2011) (citation omitted). Here, each discount applied by the trial court to the value of the parties' ownership interests in the Entities and in Northland Sports was supported by the evidence, as we have discussed, *supra.* Though the collective discounts are sizeable, that alone does not permit us to conclude that the trial court abused its discretion in valuing the interests.

Moreover, the Judgment ordered Husband responsible for the debts of the Entities and Northland Sports. Though Wife may well remain liable on the debts as they are owed to third parties not bound by the Judgment, Husband was ordered to exercise his best efforts to secure Wife's release from those debts, and in any event, to indemnify her for them.

Finally, we observe that Wife's emotional appeal is disingenuous in light of her position at trial. Husband testified that it was his preference that Wife remain a co-owner with him of the ownership interests in the Entities. Wife advised the trial court that she was not interested in retaining an ownership interest in the Entities, however. Wife's post-Judgment complaint that she has been "unreasonably prejudiced by the trial court's use of excessive discounting to virtually eliminate her interest in the significant marital estate obtained throughout" her marriage to Husband "while leaving [Wife] liable for the significant debt associated with the properties" is not persuasive.

Point two is denied.

### *Point III*

■ For her third point, Wife claims that the trial court erred in ordering the division of the parties' Victorian/antique furniture. Wife claims the Judgment is ambiguous and unenforceable because it fails to define or distinguish the Victorian furniture from other furniture, and fails to specify whether the judgment includes all Victorian furniture (given Wife's claims that there is Victorian furniture in storage) or just the Victorian furniture in the marital home.

This point has not been preserved for our review. Rule 78.07(c) provides, "In all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required

findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review." In her reply brief, Wife claims that her post-trial "Motion for Recusal of Judge and New Trial" satisfies the requirements of Rule 78.07(c). We disagree.

 The purpose underlying Rule 78.07(c) "is to ensure that complaints about the form and language of judgments are brought to the attention of the trial court where they can be easily corrected, alleviating needless appeals, reversals, and rehearings." *Villines v. Phillips*, 359 S.W.3d 44, 48 (Mo.App.W.D.2011). The motion for recusal, which was filed post-judgment, and which was denied, addressed only Wife's claim that the trial judge had a friendly relationship with Husband which required his recusal. Though the motion cites to the fact that the trial court's Judgment simply adopted certain of Husband's evidence as alleged "proof" of the friendly relationship, the motion did not in any way attempt to draw the trial court's attention to specific claims of error regarding the form or language of the Judgment, or regarding the absence of required findings. The relief Wife sought by her motion was the trial judge's recusal, not a modification or correction of the Judgment.[13] The motion did not, therefore, qualify as a Rule 78.07(c) motion.

 Even if Wife's assertion in Point three had been preserved, it is not meritorious. The record reflects that there was no ambiguity in the trial court's Judgment.

The Judgment states that "the parties are possessed of Victorian furniture and other household effects *in the marital home* currently possessed by [Wife] with a total value of $100,000 ... that [Husband] has in his possession personal effects and household furniture and a lawnmower with a value of $10,500, which should be set aside to him ... that [Wife] is possessed of $25,000 worth of non-Victorian furnishings and personal property which should be awarded unto her." (Emphasis added.) The Judgment orders, "[t]hat the parties shall meet within 45 days of the entry of this judgment *at the marital home* for the purpose of equitably dividing the Victorian furniture. [Wife] shall pick an item of furniture first, and the Respondent thereafter, and the parties shall continually alternate the selecting of furniture until said furniture is divided." (Emphasis added.)

At trial, Husband testified that he and Wife previously agreed that the Victorian furniture plus the other furniture in the marital home had a value of $100,000. Husband testified that he would be willing to take all the furniture at a value of $100,000, or if Wife wanted half of it, they could divide it piece by piece. Husband

---

13. The motion to recuse raised serious allegations about the trial judge that were not in any manner supported by affidavit or evidence. Instead, the motion reflected Wife's counsel's bare allegations that: (a) the trial court's "almost total acceptance of [Husband's] proposed judgment suggests a bias in favor of [Husband] and his attorney;" (b) the trial court's "failure to enter any orders during the six months from the hearing on temporary orders until the final trial indicates the presence of bias and favoritism;" and (c) "[Wife's counsel] is aware that [Husband's] counsel has a friendly relationship with Judge McBeth, and while such friendships are common there is an appearance that in this case, such friendship may have biased the Court in [Husband's] favor and significantly prejudiced [Wife]." Such bare and conclusory accusations "against a court or for that matter, such an accusation against any member of the Bar [are] extremely serious as [they] relate[] to the integrity of our legal system. *Groundless and flagrant accusations by disgruntled litigants should be carefully investigated by counsel for the alleged aggrieved party to determine their validity before being asserted.*" *In re Marriage of Barr*, 579 S.W.2d 833, 837 (Mo.App. W.D.1979).

testified if valued separately, he would value the Victorian furniture at $80,000 and the other furniture at a value of $20,000.

Wife testified that she believed there was at least $100,000 of "antique" furniture that Husband had purchased that Wife did not care to have. Wife thus agreed that Husband could have the furniture for $100,000, though she was also amenable to dividing that furniture.

It is of no consequence that Husband refers to the furniture at issue as Victorian and Wife refers to it as antique. It is clear from the testimony that the parties were referring to the same thing—the Victorian/antique furniture located in the marital home. The trial court's Judgment directing the parties to meet at the marital home to divide the Victorian furniture at the marital home is not ambiguous.

Wife's further assertion on appeal that the Judgment's reference to Victorian furniture is ambiguous because it does not clarify whether the process to divide the furniture includes the "Victorian" furniture in storage is disingenuous. Wife testified at trial that the Entities have "a warehouse full of model furniture." This is the only reference in the entire record to "furniture in storage." As the evidence suggests that the only furniture in storage (whether or not Victorian) belonged to the Entities and was not a marital asset, the trial court would have had no reason to direct its division.

Point three is denied.

*Point IV*

■■■ For her fourth point, Wife claims that the trial court erred in ordering each party responsible for fifty percent of all college expenses of the children because the trial court failed to consider Wife's inability to pay these expenses. We disagree.

■■■ "An appellate court will not substitute its judgment for that of the trial court absent a manifest abuse of discretion, and will not disturb a child support award unless the evidence is 'palpably insufficient' to support it." *Tracy,* 961 S.W.2d at 863. A parent's ability to pay is a factor to be considered in determining whether to order the parent to pay a percentage of a child's post-secondary educational expenses. *Ricklefs v. Ricklefs,* 39 S.W.3d 865, 878 (Mo.App. W.D.2001). "[T]he trial court is in the best position to determine the financial capability of a parent to assist in the support of the parent's child, including college expenses." *Id.* " 'We defer to the trial court's judgment on [an] award of . . . educational expenses unless the evidence is 'palpably insufficient' to support it.' " *Id.* (citation omitted).

Here, neither Wife nor Husband submitted a proposed Form 14. Wife did submit a proposed parenting plan to which Husband stipulated. The parenting plan contained a section entitled, "Child Support: Education Expenses; & Extraordinary Expenses." Under this section, Wife states:

*Child Support:*
The Court will determine what if any child support shall be awarded, one to the other.

The trial court's Judgment ordered "[t]hat the parties shall be responsible to pay the expenses of the children while the children are in their care and shall each be responsible for 50% of all college expenses as defined and limited by Paragraph 10 of this Judgment." The trial court thus did exactly what Wife directed it to do—it awarded child support, including the educational expenses, it believed should be awarded one to the other.

Though Wife failed to submit her own Form 14 for consideration, and extended

an open-ended invitation authorizing the trial court to so as it saw fit with respect to the subject of child support, we are nonetheless obliged to insure that the record supports the child support award. *Peniston v. Peniston,* 161 S.W.3d 428, 433 (Mo.App. W.D.2005). The trial court did not prepare its own Form 14, and thus did not expressly determine a presumed child support amount, a matter about which neither party complains on appeal. However, the trial court did find in its judgment as follows:

> It is inappropriate to utilize a Form 14 in this case as [Wife's] income is non-existent as a full-time student, and [Husband's] income in 2009 was a negative income in excess of negative $300,000, and Respondent anticipates in 2010 that his income will be a negative $450,000. Because a Form 14 cannot be utilized in this case, it is this Court's finding that no Form 14 can be properly calculated and in any event would be rebutted as unjust and unreasonable.

The practical import of the trial court's findings is that because each party possessed a negative income, the generation of a Form 14 would have yielded a presumed child support amount of zero, an amount the trial court would have rejected as unjust and unreasonable.[14] With respect to the imposition of an obligation on Wife to pay 50% of the children's college expenses, the record supports the trial court's rejection as unjust and unreasonable of a presumed obligation of zero with respect to these expenses. The trial court found that Wife would be able to support herself upon her graduation and employ-

ment anticipated in August 2011, and would thereafter be earning an income based on her testimony of in excess of $37,400 per year. For a portion of that period of time, through January 2012, Wife would also be receiving maintenance of $2,500 per month. Wife was awarded the marital home valued at $495,000 free and clear of debt. Wife testified she intended to sell the home and to downsize, an exercise which would afford her a source of funds. Even if Wife did not sell the marital home, its equity afforded her the ability to borrow funds, if necessary, to pay her obligations.

We cannot find on this record that the trial court abused its discretion in ordering Wife to pay 50% of the children's college expenses.

Point four is denied.

*Point V*

 For her fifth and final point, Wife claims that the trial court erred in failing to award her attorney's fees. Wife claims that the trial court abused its discretion in its failure to consider the financial resources of the parties in that the significant disparity in the parties' incomes clearly mandates an award of attorney's fees. We disagree.

 Section 452.355.1 provides that the trial court may award a party his or her attorney's fees "after considering all relevant factors including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action."

---

14. Although not raised on appeal or claimed as error by either party, we do note that before a trial court can reject a Form 14 presumed child support calculation as unjust and inappropriate, the trial court is required to determine the calculated amount *for the record. Sinclair v. Sinclair,* 837 S.W.2d 355, 358 (Mo.App. W.D.1992); *Cross v. Cross,* 318 S.W.3d 187, 190 (Mo.App. W.D.2010). The appropriate practice, even in cases where a Form 14 will generate a presumed child support amount of zero, is to determine the presumed child support amount *for the record* via a prepared Form 14.

A party's ability to pay his or her own attorney's fees is merely one of the relevant factors a court may consider under section 452.355.1. Factors other than financial resources are to be considered, and how those factors balance will vary from case to case .... The trial judge is considered an expert on the necessity, reasonableness, and value of an attorney's services.

*Tracy,* 961 S.W.2d at 865 (citations omitted). The trial court is vested with broad discretion in awarding attorney's fees and the award will be reversed only upon a finding of an abuse of discretion. *Id.*

Here, the trial court ordered that each party shall be solely responsible for their own attorney's fees. There is nothing in the record to suggest that the trial court did not consider all relevant factors in denying Wife an award for her attorney's fees. The record reflects that Wife was awarded the marital home, which was unencumbered. Wife testified that she likely would sell the home and down size, a process which would generate a source of funds to pay attorney's fees. Moreover, Wife was free to encumber the home via an attorney's fee lien, or through a loan designed to pay attorney's fees.

In reliance on *Katsantonis v. Katsantonis,* 245 S.W.3d 925, 929 (Mo.App. E.D. 2008), Wife argues one party's greater ability to pay is sufficient to support an award of attorney's fees. While that may be true, the record does not support Wife's assumption that Husband had a greater ability to pay her attorney's fees than she did. The trial court concluded (as we have discussed) that Husband was unable to support himself at the time of trial. Husband was thus in no better position to pay Wife's attorney's fees.

Further, though a party's greater ability to pay may be sufficient to support an award of attorney's fees, that factor alone is not dispositive, and is merely one factor among many the trial court is to consider. *See Cohen v. Cohen,* 178 S.W.3d 656, 674 (Mo.App. W.D.2005) (the fact that one spouse's income is greater than the other's does not compel an award of attorney's fees; the trial court must consider "all relevant factors" in determining whether an award of attorney's fees is justified).

We find no abuse of discretion in the trial court's decision to require each party to pay its own attorney's fees. Point five is denied.

### Conclusion

We affirm the trial court's judgment.

All concur.